EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JUAN SARRIA PACHECO, acusado y apelante.

Núm. 8363.—*Sometido:* Enero 15, 1941. *Resuelto:* Enero 21, 1941.

*A. Reyes Delgado, P. Santos Borges* y *F. Quirós Méndez,* abogados del apelante; *Hon. Procurador General George A. Malcolm* y *R. A. Gómez, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Juan Sarria Pacheco y Carmelo Berdecia eran policías insulares destacados en Ponce en y antes del primero de enero de 1936. Los dos fueron acusados de asesinato en segundo grado por la muerte de Alesso Martinó. Juzgado separadamente y convicto del delito imputádole, fué sentenciado Sarria Pacheco a la pena de doce años de presidio con trabajos forzados. No existe controversia en cuanto a los hechos, excepto en lo que respecta a una frase pronunciada por el policía Berdecia, a la cual nos referiremos más adelante.

De acuerdo con la prueba, la noche del 31 de diciembre de 1935 el interfecto Martinó hirió a un individuo llamado Américo Delgado, ocultándose después en una habitación del Hotel "Hogar", en Ponce. El policía José F. Cordero, al tener conocimiento del hecho, se dispuso a arrestar a Martinó y a ese efecto fué al Hotel Hogar, penetró en la habitación donde se hallaba Martinó, violentamente lo sacó de allí y mientras bajaban la escalera del hotel, forcejeando, pues Martinó no se dejaba arrestar, el policía Cordero tuvo que darle un golpe con el rotén para reducirlo a la obediencia, agarrándose ambos, y en esos momentos Martinó, con un punzón que portaba, infirió dos heridas al policía. A causa de las heridas recibidas, Cordero no pudo dominar a Martinó, quien se dió a la fuga. Enterado el policía Sarria de lo sucedido, persiguió a Martinó en un automóvil y al darle alcance, bajó del vehículo y a pesar de que Martinó le decía que no le pegase, que estaba dispuesto a entregarse, le propinó un gran número de golpes con el rotén, produciéndole varias heridas y contusiones en la cabeza, en la frente y en otras partes del cuerpo. Intervinieron algunas personas que acompañaban a Sarria en el automóvil, logrando que dejase de agredir a Martinó, quien sangrando profusamente, fué conducido por el policía Sarria y los que lo acompañaban al Hospital Tricoche como a las dos de la mañana del primero

de enero de 1936. No se encontró un médico en el Hospital, porque el que se hallaba de guardia se encontraba en un baile en el Club Deportivo, por lo que tuvieron que dejar a Martinó en una camilla en la sala segunda del hospital, mientras se conseguía el médico. Poco antes de llegar Martinó habían traído al policía Cordero, poniéndolo en la sala primera del mismo hospital. Mientras Martinó yacía en la camilla, quejándose de los golpes recibidos y sangrando profusamente, Sarria se hallaba en la misma sala junto a él, esperando que fuese curado para conducirlo a la cárcel. Llegó el policía Berdecia, vió a su compañero Cordero y a Martinó heridos y luego salió con el chófer de la ambulancia del hospital y una o dos personas más a buscar el médico al Club Deportivo, ya que habían sido inútiles las gestiones practicadas para localizarlo por teléfono. Como había varios automóviles frente al hospital, el chófer tardó algo en sacar el suyo. Cuando ya habían empezado la marcha hacia el Club Deportivo, el policía Berdecia le dijo al chófer: "Para, que voy a matar a ese sinverguenza." Trataron de impedir que Berdecia volviera atrás, pero al fin lo logró y sus compañeros lo siguieron. Al llegar a la sala donde se hallaba Martinó, dijo: "¿Dónde está el bandido ése?", y acto seguido Berdecia llevó la mano a su revólver y dirigiéndose al policía Sarria, le dijo: "Si tú no lo matas, lo mato yo." Inmediatamente Sarria sacó su revólver e hizo un disparo sobre Martinó, que se hallaba en la camilla, y dijo: "Ya está." Salieron entonces Berdecia y Sarria de la sala donde se hallaba Martinó y uno de los testigos vió que este último tiró algo que sacó del revólver, apareciendo en la mañana siguiente en los alrededores del sitio, el casquillo de bala de revólver que fué presentado luego en evidencia. Dos horas después de recibir el balazo, Martinó fué conducido a la Clínica del Dr. Pila, donde lo atendió el Dr. Passalacqua. No obstante los esfuerzos de dicho médico, el herido falleció en la tarde del mismo día primero de enero, a consecuencia

de una hemorragia interna que le produjo la bala al perforar el canal de la espina dorsal.

■■ Sostiene el apelante que la corte sentenciadora incurrió en error al permitir que Juan L. Oliver declarase como perito en balística, porque a juicio del apelante no había sido debidamente calificado como tal, y alega también que constituyó error el admitir en evidencia el casquillo y el plomo que se declaró haber sido extraído del cuerpo del infortunado Martinó.

En verdad, no acertamos a comprender qué fin persiguió el fiscal y por qué se perdió tanto tiempo en la presentación de una evidencia tan innecesaria. Todos los testigos están de acuerdo en que allí sólo se hizo un disparo y que éste fué hecho por el acusado Sarria. La enfermera que recibió a Martinó al llegar al hospital Tricoche, Teresa Veve, declaró que éste tenía varios golpes en la cabeza y rasguños en el vientre, y que no tenía ninguna herida de bala, constándole esto porque lo examinó tan pronto llegó al Hospital (T. de E., pág. 102.) El propio acusado admite que fué él quien hizo el disparo fatal, pero trata de justificar el homicidio alegando ciertas defensas de que luego habremos de ocuparnos. En estas circunstancias, ¿qué necesidad había de presentar evidencia para probar que la única bala que se disparó —y que el acusado admite haberla disparado—no pudo ser de otro revólver que del que tenía el propio acusado? Nos explicamos que esta prueba se hubiera presentado si Sarria hubiese negado haber disparado, o si, admitiéndolo, se hubiese presentado evidencia de que otras personas habían disparado, y de ese modo pudiese surgir la duda de quién fué el que causó la muerte.

Siendo como era absolutamente innecesaria esta prueba, no existe la menor posibilidad de que en manera alguna pudiera haber perjudicado al acusado. Siendo ello así, asumiendo a los efectos de la discusión que tal prueba no fuera admisible por las razones alegadas por el apelante, el error

al admitirla, de haber existido, no es motivo de revocación. Artículo 142 del Código de Enjuiciamiento Civil.

También se ofreció y fué admitida en evidencia la camilla en que fué puesto Martinó cuando llegó herido al hospital Tricoche. En verdad no comprendemos qué luz podría dar esa prueba en este caso.

 Al terminar la prueba de cargo, el fiscal solicitó de la corte que el jurado fuese trasladado al hospital Tricoche, para que viendo el sitio donde se desarrollaron los hechos, pudiese comprender mejor la prueba presentada. Se sugirió que la testigo Teresa Veve podría indicar al jurado el sitio que ocupaba cada una de las personas mencionadas por los testigos. Se suscitó una controversia entre el fiscal y la defensa, porque el acusado propuso que se instruyese a la Srta. Veve que se limitase a indicar al jurado los sitios en cuestión, y el fiscal se oponía sosteniendo que no podía impedírsele que ella contestase las preguntas que le hacía el jurado. Finalmente, la corte dictó la siguiente resolución:

"Bueno, la corte ordena que el márshal llame por teléfono inmediatamente a la Plaza para que se traigan aquí a la corte cuatro automóviles públicos. Y reconsidera su resolución anterior y resuelve ahora declarando con lugar la moción del fiscal sobre inspección ocular, y el juez acompañará al jurado, con el taquígrafo y la señorita Veve, al hospital Tricoche. Pone a disposición también del abogado defensor y del fiscal un vehículo para que se trasladen también allí, limitándose entonces la inspección ocular a que la señorita Veve, en presencia del juez, de los señores del jurado, y de las partes, tomando el taquígrafo, vaya indicando los sitios donde están las distintas salas, pasillos, la camilla donde estaba—lo que ha dicho el abogado sobre lo cual no tiene inconveniente. Y que ya entonces allí la corte, estando el taquígrafo y el fiscal y el abogado defensor, si éstos desean hacerle alguna pregunta en presencia del jurado a la señorita Veve, la hagan, para que ella indique, igual que lo hizo aquí, dónde estaban parados, exclusivamente, ella, Berdecia y el herido. De manera que sería una inspección ocular que casi equivaldría a trasladarse la corte allí, pero ello únicamente a los fines exclusivos de si surge alguna pregunta de parte de algún señor jurado que desee saber cualquiera de esos otros hechos, tomándola

el taquígrafo para que si alguna de las partes desea oponerse, lo haga, y la corte pueda resolver allí mismo.

"Creo que eso es más completo y salvaguardia más los derechos del acusado en cuanto a que pueda el jurado hacer alguna pregunta que complique el procedimiento.

"De manera que si el fiscal no tiene más prueba por ahora, los señores del jurado pueden retirarse al cuarto del jurado mientras se declara un receso en lo que llegan los automóviles para trasladarnos allí. Pueden salir los señores del jurado..." (T. de E. pág. 172.)

A pesar de los términos en que está concebida la resolución de la corte, la Srta. Veve no se limitó a indicar los distintos sitios al jurado, sino que fué examinada sobre cuestiones extrañas al motivo de la inspección ocular. Véanse las páginas 177, 178 y 179 de la transcripción de evidencia. También fué examinado el testigo Mariano Clavell, que encontró el casquillo presentado en evidencia. El artículo 258 del Código de Enjuiciamiento Criminal, con referencia a la inspección ocular, prescribe:

"Art. 258. *Cuando en la opinión del tribunal,* sea conveniente que el jurado examine el lugar en que, según la acusación, fué cometido el delito, o en donde haya ocurrido cualquier otro hecho material, podrá ordenar la conducción del jurado en masa, bajo la custodia de un oficial, al expresado sitio, el cual le será enseñado por persona nombrada al efecto por el tribunal; y dicho oficial del tribunal prestará juramento de que no permitirá que ninguna persona, incluso él mismo, hable o se comunique con el jurado, acerca de ningún asunto relacionado con el juicio, y que regresará al tribunal con el jurado, sin dilación innecesaria, o en el plazo que se especifique." (Itálicas nuestras.)

La inspección ocular debe limitarse exclusivamente a indicar a los señores del jurado los distintos sitios que han sido mencionados o que se intenta mencionar en el curso de la prueba para así facilitar la mejor inteligencia de la misma. No deben examinarse testigos ni hacerse ninguna clase de argumentos. Debemos agregar que no es al jurado, sino al juez que preside el tribunal, a quien incumbe determinar si es conveniente o no que se practique una inspección ocular.

Nada dice la ley sobre el derecho del acusado a estar presente mientras se efectúa una inspección ocular. El Tribunal Supremo de los Estados Unidos, en el caso de *Snyder* v. *Massachusetts*, 291 U. S. 97, 78 L. ed. 674, 90 A.L.R. 575, en una opinión emitida por el Juez Cardozo, sostuvo que una inspección ocular no es evidencia y que por lo tanto el privar al acusado de estar presente mientras se lleva a efecto una inspección ocular no viola la cláusula constitucional del debido procedimiento de ley. Debemos consignar que en dicho caso hubo una opinión disidente del Juez Roberts, con la cual estuvieron conformes los Jueces Brandeis, Sutherland y Butler, en la cual se sostiene que una inspección ocular equivale a la presentación de evidencia y que por consiguiente el acusado tiene derecho a estar presente mientras la misma se lleva a efecto.

A nuestro juicio, la mejor práctica es permitir al acusado presenciar la inspección ocular a menos que existan razones poderosas para impedírselo, como, por ejemplo, cuando la vida del acusado corra peligro en caso de asistir a ella. Hallándose presente el acusado en la inspección ocular, puede llamar la atención a su abogado de cualquier error en que se incurra al mostrar el sitio o sitios en cuestión, y hacer a éste cualquier sugestión sobre cualquier punto o sitio que deba ver el jurado.

En el caso de autos no se celebró una inspección ocular. Más bien se trasladó la corte al Hospital Tricoche como dijo el juez (T. de E., pág. 173), y allí se presentó cierta prueba extraña a la inspección ocular. El artículo 2 de nuestra Ley Orgánica garantiza al acusado en cualquier causa criminal el derecho a confrontarse con los testigos que declaren en su contra, y en este caso, si del récord apareciese afirmativamente que él no estuvo presente, convendríamos con el acusado en que fué privado de un derecho constitucional. Pero del récord aparece que al iniciarse el caso estuvo presente el acusado y que mientras declaraban los testigos, muchos de ellos se referían a él señalándolo como presente

en la sala de la corte. En tales circunstancias, no apareciendo del récord afirmativamente que el acusado no se hallaba presente mientras se sustanciaban los procedimientos que tuvieron lugar en el Hospital Tricoche, surge la presunción de la regularidad de los procedimientos y por lo tanto que estuvo presente durante la llamada inspección ocular. *State v. Clark,* 85 A.L.R. 502 (Wash. 1930); *State* v. *Costello,* 69 P. 1099 (Wash); *Gaines* v. *Washington,* 277 U. S. 81 (1928), 72 L. ed. 793, donde se dijo:

"Se alega por el acusado que no estuvo personalmente presente o no estuvo en un sitio donde él podía oír la prueba. Nada existe en el récord de los procedimientos del juicio que sostenga tal alegación. No se tomó ninguna excepción durante el juicio por este motivo. Se basa solamente en *affidavits* radicados en el caso después que la Corte Suprema había confirmado la sentencia. Esto fué demasiado tarde. *Frank* v. *Mangum,* 237 U. S. 309, 340, 59 L. ed. 969, 985, 35 Sup. Ct. Rep. 582."

Véanse también 8 R.C.L. 95, y casos citados, y también por analogía el de *Franzeen* v. *Johnston, Warden,* 111 F. (2) 817, 820.

■ Se queja el apelante de que la corte no permitió que declarase Américo Delgado, sobre hechos ocurridos entre él y el interfecto la noche del 31 de diciembre de 1935. Es perfectamente claro que la riña entre Martinó y Delgado, o la agresión por parte de Martinó a Delgado, si se quiere, y que dió lugar al arresto que intentó practicar el policía Cordero, arresto que más tarde llevó a efecto el acusado en la forma que ya conocemos, en nada pudo afectar el crimen cometido por éste, pues el acusado no pretende que al matar al interfecto lo hiciera en defensa de Delgado, y asumiendo que Martinó sin justificación alguna hubiese herido a Delgado, este hecho no autorizaba al acusado a matar a Martinó.

■ Tampoco erró la corte al negarse a transmitir instrucciones sobre homicidio voluntario. De la prueba concluyentemente resulta que en ningún momento Martinó atacó al acusado. Por el contrario, fué éste quien sin justificación legal

alguna lo agredió cruelmente con el rotén, a pesar de que el interfecto prometía entregarse para que no lo agrediese. Alega, sin embargo, el acusado que lo mató porque vió a su compañero Cordero en la sala núm. 1, que sangraba por las heridas que le había causado Martinó y que como él quería tanto a Cordero, esto le produjo un arrebato de cólera que le impulsó a matar al interfecto. Tal defensa es insostenible, pues Cordero había llegado al hospital antes que Martinó y hacía media hora o tres cuartos de hora que el acusado estaba custodiando al interfecto, y de acuerdo con toda la prueba, estaba tranquilo esperando que curasen a Martinó para llevarlo a la cárcel. No fué hasta que Berdecia le dijo: "Si tú no lo matas, lo mato yo", que el acusado se dispuso a realizar el crimen. La presencia del interfecto, bañado en sangre como se hallaba por heridas que de manera tan injustificada como cruel le causó el acusado, lejos de producirle un arrebato de cólera debió inspirarle profundo remordimiento y compasión. Asumiendo que Berdecia hubiese dicho al acusado: "Si tú no lo matas, te mato yo", como pretenden el acusado y algunos de sus testigos, y que por virtud de tal amenaza y creyendo que corría riesgo de perder su vida, el acusado hubiera dado muerte a Martinó, en ese caso el delito cometido por el acusado sería asesinato, y en manera alguna podría alegar que la muerte había sido causada en defensa propia. A este efecto se dice en 3 *Warren on Homicide,* pág. 170:

"*Muerte bajo coacción.*—Prueba de que el acusado fué ordenado a cometer el homicidio por uno que le amenazaba con quitarle su vida si rehusaba hacerlo, y que creyendo que la amenaza se llevaría a efecto, para salvar su propia vida mató al interfecto que se hallaba a una milla de distancia del sitio donde se hizo la amenaza, es suficiente para sostener una convicción de asesinato deliberado."

Véanse también 8 R.C.L., sec. 100, pág. 125, y el caso de *State* v. *Weston,* 219 P. 180 (Ore., 1923), y autoridades citadas en el mismo.

Por las razones expuestas no estaba justificada la corte en dar instrucciones sobre homicidio voluntario.

█ Se queja el apelante de que la corte se negó a citar al Director del Manicomio Insular en Río Piedras, para que compareciera al acto del juicio con el récord de la paciente Juana Sarria Pacheco, hermana del acusado. La moción se presentó por el acusado después de haber terminado toda la prueba de cargo y de descargo en un juicio bastante largo. En tales circunstancias, no abusó de su discreción la corte sentenciadora al negarse a citar al Director del Manicomio, pues la moción se presentó tardíamente, aparte de que no vemos en qué hubiese podido beneficiar al acusado el hecho de tener una hermana loca, cuando la única prueba en que pretende él basar su locura es en la naturaleza de los actos por él realizados. Pero aún así, de los autos resulta que la corte permitió al acusado declarar que tenía una hermana recluída en el Manicomio Insular en calidad de paciente hacía como diez años, lo que le permitió lograr el fin que perseguía con la declaración del Director del Manicomio Insular.

Por último, no puede imputarse a la corte sentenciadora que actuara movida por pasión, prejuicio o parcialidad. Si de algo pecó la corte fué de demasiada benevolencia al imponer al acusado la pena de doce años de presidio en un caso que revela tanta crueldad por parte del acusado.

*Por lo expuesto, procede desestimar el recurso y confirmar la sentencia apelada.*