El Pueblo de Puerto Rico, demandante y apelado, *v.* Ramón Cruz Reyes, acusado y apelante.

Núm. 8893.—*Sometido:* Febrero 18, 1942. *Resuelto:* Marzo 12, 1942.

*Juan Valldejuli* y *R. Hernández Matos,* abogados del apelante; *Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Este recurso fué interpuesto contra la sentencia de diez y siete años de presidio impuesta al apelante al ser convicto de asesinato en segundo grado por la muerte de Rafael Igaravídez, Jefe de Distrito de la Policía Insular en Ponce.

El primero de los errores señalados está basado en la negativa de la corte sentenciadora a suspender el juicio por motivo de enfermedad. de los abogados de récord, Sres. R. Martínez Nadal y José R. Gelpí. La moción de suspensión se presentó precisamente el mismo día en que iba a llamarse a la vista del caso, el 25 de noviembre de 1940, resultando de los autos que el delito imputado al acusado se cometió en 29 de junio de 1938, que el juicio de este caso fué señalado por primera vez para el 24 de abril de 1939, y que desde esa fecha hasta el 25 de noviembre de 1940 fué suspendido, tres veces, siempre por el mismo motivo y a petición del acusado, transcurriendo así un año y siete meses desde el primer señalamiento hasta la fecha en que por cuarta vez se solicitó la suspensión. En tales circunstancias no vemos cómo pueda alegarse seriamente que la corte abusara de su discreción al denegar la cuarta suspensión. De haberla concedido hubiera cometido un claro abuso de discreción.

El segundo de los errores imputados a la corte sentenciadora consistió en que el día señalado para el juicio y antes de llamarse a su vista, la corte, en ausencia del acusado, excusó a trece de los jurados que habían sido citados para conocer del caso. El hecho de que la corte, haciendo buen o mal uso de su discreción, excusara a trece de los jurados citados para conocer del caso, en las circunstancias antes indicadas no constituye error que justifique en manera alguna la revocación de la sentencia dictada. El acusado no tiene ningún derecho adquirido a ser juzgado por determinadas personas y el excusar a un jurado de servir en un caso descansa en la sana discreción de la corte. En el de autos,

los señores que fueron excusados tenían razones legales para ello, siendo en su mayoría, como expresó la corte, empleados de los gobiernos Federal e Insular. Sin embargo, es mejor práctica conceder estas excusas en corte abierta, en presencia de las partes y de los demás jurados citados, de manera que todos puedan conocer el motivo de ellas, evitando así que aquéllos que no son excusados puedan creer que ha habido discrimen contra ellos.

▄ El tercero de los errores señalados consiste en no haber permitido la corte al Sr. F. Colón Díaz unirse a la defensa del acusado. Mientras declaraba el undécimo de los testigos de cargo, uno de los abogados de la defensa, el Sr. Valldejuli, solicitó de la corte que hiciera constar en récord que el Lic. F. Colón Díaz comparecía en unión de ellos como abogado del acusado. Se opuso el fiscal, y la corte, habida cuenta de que el jurado había sido constituído a base de que los únicos abogados del acusado lo eran los Sres. Hernández Matos y Valldejuli, y teniendo en cuenta que pudiese haber entre los señores del jurado constituído desde el día anterior, alguno de ellos que por sus relaciones de abogado y cliente, de parentesco o de cualquier otra índole con el Lic. Colón Díaz debiera haber sido recusado por el fiscal, motivada o perentoriamente, denegó lo solicitado, puesto que de admitir al Lic. Colón Díaz como abogado del acusado en el estado en que se hallaba el juicio, privaría de ese derecho al fiscal. Dentro de las circunstancias, ejercitó correctamente la corte su discreción al no acceder a dicha solicitud.

▄ El cuarto señalamiento consistió en que según la defensa el fiscal, al exponer el caso al jurado, hizo comentarios sobre la reputación del acusado. Este último, en la fecha del delito, era policía insular destacado en Ponce bajo las órdenes del Jefe Igaravídez. El fiscal, dirigiéndose al jurado, manifestó que el móvil del crimen en cuestión había sido la indisciplina e insubordinación del acusado. La presunción de inocencia que reconoce la ley a favor de todo acu-

sado, impide que se presente evidencia de su mala reputación ó carácter a menos que él previamente la haya puesto en controversia presentando evidencia de su buena reputación o carácter; pero una cosa es la reputación o carácter de un individuo y otra es su conducta relacionada con el crimen que se le imputa. Todo delito *malum in se* implica necesariamente un acto de mala conducta y cuando dicho acto es parte del crimen o tiende a demostrar el móvil que indujo a su comisión, es perfectamente admisible en evidencia, y siéndolo, puede hacerse referencia al mismo al exponerse el caso al jurado. Véase *Pueblo* v. *González,* 57 D.P.R. 744.

El séptimo de los errores señalados consistió, según la defensa, en haberse admitido en evidencia el pliego de cargos que había formulado el interfecto al acusado y al cual se refería el fiscal cuando en su exposición del caso al jurado les anunció que se proponía probar que el móvil del delito había sido la mala conducta o indisciplina del acusado. Al efecto, el fiscal ofreció en evidencia un pliego de cargos formulados contra el acusado, suscrito por el Jefe Igaravídez el mismo día del crimen—el 29 de junio de 1938. La firma del Sr. Igaravídez fué identificada suficientemente por el testigo Salvador G. López de Azúa. La del acusado, que aparecía también en el pliego de cargos, no lo fué. Sin duda, esta última firma era necesaria para demostrar que el acusado tenía conocimiento de los cargos formulados contra él, conocimiento que era indispensable para que dicho pliego de cargos pudiese haber influído en su ánimo en relación con la comisión del delito; pero como en la página 355 y siguientes de la transcripción de evidencia el propio acusado, contestando el interrogatorio directo de sus abogados, declaró que el día de autos, a las seis de la tarde, le informaron dichos cargos, quedó subsanado el defecto de la prueba en cuanto a la identificación de la firma. Siendo ello así, no erró la corte sentenciadora al admitir el documento en evidencia.

 Consideremos ahora el quinto de los errores señalados. Se refiere a la inspección ocular, durante la cual alega el apelante el jurado recibió evidencia en ausencia suya y de sus abogados.

Al terminar su prueba directa, el fiscal solicitó de la corte que ordenase una inspección ocular de la escena del crimen. Se opuso la defensa, alegando que no era necesario. Insistió uno de los fiscales, y como la corte indicara que dejaría la cuestión a ser resuelta por el jurado, es decir, que la ordenaría si el jurado la creía necesaria, y éste manifestó sus deseos de ver el sitio en cuestión, se acordó la inspección ocular, llevándose a efecto al terminar la prueba directa de la defensa.

Antes de examinar el acta de la inspección ocular en este caso celebrada, parece conveniente dejar bien establecidos los verdaderos límites de una inspección ocular de acuerdo con los dictados de la ley y la jurisprudencia, para determinar después si la efectuada en este caso sobrepasó dichos linderos, y si así fuere, si con ello se perjudicaron los derechos sustanciales del acusado a tal extremo que sea necesaria la revocación de la sentencia. Examinemos en primer término la ley aplicable, que lo es en materia penal el artículo 258 del Código de Enjuiciamiento Criminal, que literalmente dice así:

"Art. 258.—*Cuando en la opinión del tribunal,* sea conveniente que el jurado examine el lugar en que, según la acusación, fué cometido el delito, o en donde haya ocurrido cualquier otro hecho material, podrá ordenar la conducción del jurado en masa, bajo la custodia de un oficial, al expresado sitio, el cual le será enseñado por persona nombrada al efecto por el tribunal; *y dicho oficial del tribunal prestará juramento de que no permitirá que ninguna persona, incluso él mismo, hable o se comunique con el jurado, acerca de ningún asunto relacionado con el juicio,* y que regresará al tribunal con el jurado, sin dilación innecesaria o en el plazo que se especifique." (Bastardillas nuestras.)

El propósito de una inspección ocular es auxiliar al jurado, o en su caso al juez, a apreciar correctamente la prueba que haya desfilado o se proponga desfilar ante él. En ciertos casos la inspección, lejos de auxiliar, puede producir confusión y hasta inducir a error al juzgador. De ahí que la ley haya confiado a la sana discreción del juez determinar en cada caso si debe o no concederla, y esa facultad no debe delegarla al jurado ni a ningún otro funcionario. En el ejercicio de su discreción el juez debe previamente determinar si la inspección es necesaria para la mejor inteligencia de la prueba y de las cuestiones de hecho que puedan surgir. Si lo fuere, se cerciorará de que el sitio u objeto a ser examinado se halla sustancialmente en las mismas condiciones en que se hallaba al cometerse el delito, pues una variación sustancial en el sitio u objetos necesariamente frustraría el propósito de la inspección. Nuestro estatuto, como hemos visto, deja a discreción del juez nombrar una persona que enseñe el sitio al jurado. Sin embargo, la mejor práctica es que el juez se traslade al sitio con el jurado. De esa manera no sólo puede dirigir el procedimiento a seguir durante la inspección y evitar que se realice acto alguno que pueda producir un *mistrial,* si que también lo coloca en condiciones de levantar un acta de la inspección de modo que conste en forma auténtica lo allí efectuado y pueda un tribunal de apelación resolver cualquier cuestión que se suscite con respecto a la validez del acto celebrado. También deben concurrir los abogados de una y otra parte para que indiquen o señalen al jurado los distintos sitios, objetos o distancias que deseen sean observados, absteniéndose, por supuesto, de toda argumentación o comentario en relación con el caso. Esto no impide, como se hizo en este caso, que un testigo designado por la corte, ilustrando su propia declaración, señale sobre el terreno la posición que ocupaban el acusado y la víctima, respectivamente, e ilustre gráficamente la forma

en que quedó la víctima, como podría haberlo hecho sobre un papel o una pizarra en la sala de sesiones.

En el caso de *Snyder* v. *Massachusetts,* (1934), 291 U. S. 97, 78 L. ed. 674, 90 A.L.R. 575, el Juez Cardozo resume en los siguientes términos la práctica que desde tiempos remotos se ha seguido en relación con la inspección ocular:

"Desde una fecha tan remota como el año 1747, existe el récord de un precedente que ilustra el procedimiento seguido en una inspección ocular. La práctica consistía entonces en poner al jurado bajo la dirección de las personas que debían mostrarle el sitio (*showers*), quienes prestaban juramento de que llevarían al jurado al sitio que había de ser inspeccionado... En aquel tiempo no se celebraban inspecciones oculares en casos criminales sin el consentimiento de ambas partes, la Corona y el acusado, excepto, según parece, en casos por mantener un estorbo público (*nuisance*). (Citas.) En 1825, sin embargo, un estatuto aplicable a Inglaterra y a Gales suplió el defecto de esa facultad, si es que tal defecto había existido. 6 George IV, capítulo 50, sección 23. De ahí en adelante, en cualquier caso, ya fuere civil o criminal, podía ordenarse una inspección ocular a discreción del tribunal. La forma del juramento administrado a los *showers* aparece en los libros de decisiones. Por ejemplo, en *Regina* v. *Whalley* (1847) 2 Cox Crim. Rep. 231, el juramento administrado fué éste: '¿Jura usted que atenderá a este jurado, y bien y fielmente le indicará el sitio donde el delito imputado a T. W. se alega fué cometido; y que no les hablará con respecto al supuesto delito que se imputa a T. W., excepto para describir el sitio indicado?' (Citas.) De igual modo, en nuestro país, la facultad de ordenar una inspección ocular en casos criminales ha sido aclarada por medio de estatutos apropiados en casi todos los Estados (véanse los estatutos acopiados en 2 Wigmore, *Evidence,* sec. 1163), a pesar de que existen ejemplos en que la facultad se ha considerado como inherente. (Citas.) Los estatutos aprobados se ajustan generalmente a la práctica seguida en los tribunales ingleses, disponiéndose en ellos la presencia del juez o, en su discreción, el nombramiento de *showers* juramentados en la forma antigua. (Véanse los estatutos y decisiones en 3 Wigmore, *Evidence,* secciones 1802 y 1803, y volumen 2, sección 1163; véase también *Brooklyn* v. *Patchen,* 8 Wend. 47, 65; *State* v. *Perry,* supra (121 N. C., a la página 536), 27 S. E. 997, 61 Am. St. Rep. 683.)"

Veamos ahora en qué consistió la inspección ocular en este caso celebrada. Por ser relativamente breve, y para más exactitud, transcribiremos a continuación el acta que se levantó al efecto:

"Inspección Ocular

"Juez:

"En Ponce, Puerto Rico, hoy día 27 de noviembre de 1940, siendo las 12:12 minutos de la tarde de este día, se reunieron frente a la Droguería 'Royal', situada en la esquina de la Plaza Muñoz Rivera, calle Isabel de esta ciudad de Ponce, el Juez que preside, el Secretario señor Carlos Suárez, el taquígrafo Sr. Justo M. Bodón, los fiscales Sres. Pedro Rodríguez Serra y Guillermo S. Pierluisi, y los señores del jurado que componen el 'panel' que está interviniendo en este caso, y todo ello en cumplimiento de la solicitud que hizo el jurado para situarse en este sitio, a fin de hacer la correspondiente inspección ocular, habiendo el jurado hecho dicha solicitud en corte abierta, a presencia del acusado Ramón Cruz Reyes y de sus abogados, Lics. J. Valldejuli Rodríguez y Rafael Hernández Matos, a quienes la corte les manifestó que deberían concurrir conjuntamente con el acusado, no habiendo hecho manifestación alguna en contrario, habiendo este tribunal así constituído esperado en este sitio durante veinte minutos con el tráfico suspendido.

"La Corte hace constar que habiendo pasado veinte minutos sin que hubiese comparecido ninguno de los abogados de la defensa, ni el acusado, se ordenó al submárshal Morales, que estaba presente conjuntamente con el submárshal Figueroa, para que llamase por teléfono a los abogados, habiendo localizado al Lic. Hernández Matos en su oficina, habiéndole manifestado que no deseaba concurrir, y que el compañero Valldejuli se había retirado con el acusado.

Submárshal Sr. Figueroa:

"El señor Hernández Matos informó que el señor Valldejulli sería el que vendría a la inspección ocular.

Juez:

"La corte hace constar que ha visto pasar al acusado en un automóvil cuando estábamos en la esquina.

Declaración de Porfirio Rodríguez.

(Se le toma juramento por el Juez.)

Juez: ¿Cómo se llama usted? — Testigo: Porfirio Rodríguez. — ¿Ocupación?—Policía Insular.—¿Dónde se encontraba usted, ahora a las doce y quince minutos?—En la esquina de la Farmacia Royal.—

¿Usted conoce al acusado en este caso Ramón Cruz Reyes?—Sí, señor.—¿Conoce a los abogados defensores de él?—De vista.—¿Usted ha visto últimamente al acusado Ramón Cruz Reyes y a sus abogados? —Ví a Ramón Cruz Reyes guiando un carro, y a uno de los abogados.—¿A qué hora?—Hace un momento.—En vista de ello, la corte va a pasar lista a los señores del jurado para estar en ley. (El juez pasa lista a los señores del jurado, estando todos presentes.) JUEZ: Siendo éste el momento anunciado para la inspección ocular, y habiéndose solicitado por el jurado y ordenado por la corte, que compareciera el testigo Jorge Brandon, la corte va a proceder a tomarle juramento. (Se le toma juramento al señor Brandon por el propio juez.) Los señores del jurado podrán ahora inspeccionar el sitio con el testigo señor Brandon.—JURADO JOAQUÍN MARTÍNEZ ANDINO: Señor Brandon, ¿dónde estaba usted cuando sucedió el caso?— Testigo JORGE BRANDON: Exactamente bajo esas palmas; entre las dos palmas que se divisan, frente a la caseta del teléfono. Bajo esa palma, la primera.—JURADO JOAQUÍN MARTÍNEZ ANDINO: ¿Quiere ir a pararse en el sitio donde usted estaba?—SR. BRANDON: Sí, señor.— JUEZ: Párese en el sitio donde usted estaba. (El Sr. Brandon se para en el sitio indicado por él anteriormente.)—JUEZ: Se hace constar que el testigo se para más o menos cerca de la primera palma, parte lateral norte, con un pie puesto sobre una verja como de pie y medio de altura, mirando el testigo hacia el Parque de Bombas.— SR. BRANDON: Estaba parado aquí y el Policía Miguel Angel Ríos aquí. Yo venía en esta actitud.—JUEZ: ¿Usted se ha parado allí?— Estaba con el pie derecho puesto sobre una de las tablitas del jardín, mirando hacia el Parque de Bombas. Escuché la detonación, miré automáticamente hacia el sitio y vi caer al Capitán Igaravídez.— JURADO SEGUNDO CASTRO: ¿Dónde cayó?—SR. BRANDON: Vi al Capitán Igaravídez en este sitio, y al agresor aquí.—JUEZ: ¿Al Capitán Igaravídez, frente al chaflán de la Farmacia Royal, en la esquina que mira hacia la Plaza Muñoz Rivera?—Sí, señor, y el policía estaba en esta posición.—¿De la parte Sur mirando hacia el Norte?—Sí, señor.—¿Y el Capitán Igaravídez?—De norte a sur. El capitán Igaravídez, cuando escuché la detonación, iba cayendo hacia atrás, y supongamos que cayó aquí.—JURADO MARTÍNEZ ANDINO: ¿Cayó para atrás?—Iba cayendo hacia atrás a medida que me acercaba, y me detuve como a diez pies de distancia. Vi al matador y me detuve aquí.—JUEZ: Se hace constar que son como cinco pasos de la franja de la acera, y como siete u ocho pasos de donde se dice que cayó el capitán Igaravídez.—SR. BRANDON: Aquí estaba el policía Miguel Angel Ríos detrás del poste.—JUEZ: Se miden como tres pies más

o menos de un poste, que queda cerca donde se dice que cayó el capitán Igaravídez.—JURADO RAFAEL MAGES: Dígame, testigo, ¿usted dice que cuando sonó el primer disparo usted estaba parado allí?— SR. BRANDON: Sí, señor.—¿Entonces usted seguía corriendo para acá?—Caminando ligeramente.—Vuelva testigo, váyase a aquel sitio y vuelva al sitio éste. (El testigo señor Brandon hace lo que le indica el jurado señor Mages)—JUEZ: Se marca con un reloj de tiempo diez segundos, hasta la distancia donde dice que se paró el testigo, después de haber oído la primera detonación.—JURADO SR. MAGES: ¿Había algunas personas en este sitio?—SR. BRANDON: No recuerdo. Mi mirada estaba concentrada hacia el matador.—¿Había algo en este sitio?—Posiblemente un coche. Yo tenía la mirada concentrada en el matador.—JURADO SR. MAGES: ¿Estaba alumbrado este sitio?—Sí, señor, había luz.—Cuando usted estaba ahí, ¿él hizo el segundo disparo?—Cuando estaba aquí vi al agresor hacer el segundo disparo. Entre el primer y el segundo disparo hubo un lapso de tiempo. No fué 'tan, tan', sino 'tan .. tan'. JURADO JOAQUÍN MARTÍNEZ ANDINO: ¿Esa noche estaba claro este sitio u oscuro?—Había luz.—¿Por medio de estos faroles?—Había un foco aquí en el centro, que fué eliminado.—¿Estaba alumbrada esta equina?—Había luz y la mirada mía estaba concentrada en el matador. Inmediatamente reconocí al matador.—¿Usted pudo ver el caso después del primer disparo y nunca antes?—Sí, señor, cuando escuché la detonación vi al hombre caer, y dije: '¡un crimen!' cuando estaba con el pie puesto sobre la tablita. Estaba Dimas Aromí sentado cerca y pudo escucharme.—JURADO SEGUNDO CASTRO: ¿Usted vió cuando venía el capitán?—No, señor.—JURADO LUIS F. VÁZQUEZ: ¿Cuando usted venía corriendo, se paró ahí?—SR. BRANDON: Sí, señor.—¿Y el otro guardia estaba aquí?—Sí, señor—¿Al segundo disparo?—Sí, señor. Vi la actitud del policía. Tenía o expresaba la misma emoción que yo. Estaba temblando.—JURADO JUSTO SÁNCHEZ QUILES: ¿Por dónde venía el acusado?—No sé por dónde venía. Sólo vi que la posición del acusado era mirando hacia acá, o sea, hacia la víctima. Entonces vi cuando el capitán cayó. Al caer, entonces fué el segundo disparo, en una posición así. (El testigo se acuesta en la acera, para demostrar gráficamente lo que está declarando.)—JURADO SR. MAGES: ¿El policía estaba allí?—El policía, digamos en esta posición, y cuando la víctima cayó, cayó en esta posición.—¿Mirando para dónde?—Hacia acá. Aquí, y la gorra había caído hacia atrás. Estaba calvo, y surgió de aquí un filtro de sangre hacia afuera.—¿Lado izquierdo?—Sí, señor, en esta posición. Entonces me detuve hasta que vino Miguel Rodríguez Alfonso a recoger la caja de dientes.—

JUEZ: Solamente el jurado quería ver el sitio. La corte no desea que se declaren los hechos, sino solamente la localización del sitio.—FISCAL PIERLUISI: Vamos a pedir a la corte que se le enseñe al jurado la residencia del capitán Igaravídez.—JUEZ: El jurado quería solamente saber el sitio. Ahora, si él sabe la residencia...—SR. BRANDON: La sé.—¿En qué dirección?—Frente al garage 'Tell me', hacia la calle León. La casa queda a la doblada de la esquina, en la calle León.—JURADO SR. JENARO OTERO: ¿El capitán Igaravídez estaba aquí en el suelo?—Sí, señor.—¿Ahí recibió la otra bala?—En el suelo.—¿Usted lo vió?—Sí, señor.—¿El segundo disparo?—Ya estaba en el suelo cuando el segundo disparo.—

JUEZ:

La corte hace constar que no se ha hecho más ninguna pregunta por el jurado. Es la una menos veinticuatro minutos de la tarde. Que aún a esta hora no se ha presentado abogado alguno, y especialmente ni el Lic. Rafael Hernández Matos ni el Lic. J. Valldejuli Rodríguez, ni el acusado, a pesar de no haberle manifestado a la corte su intención de no comparecer.

"Entonces, la inspección ocular ha terminado, y la corte ordena que por el taquígrafo se transcriba a la mayor brevedad posible, para que forme parte del récord." (T. de E., páginas 429–437.)

Del acta transcrita podremos ver que ni el acusado ni sus abogados estuvieron presentes, no obstante todas las oportunidades que para ello les brindara la corte. Alega el apelante, como hemos visto, que procede la revocación de la sentencia por haberse celebrado la inspección en ausencia suya y de sus abogados, y por haberse recibido evidencia en esas condiciones.

La primera cuestión que debemos resolver es: ¿reconoce la ley al acusado el derecho de estar presente en una inspección ocular, a tal extremo que su ausencia la invalide y produzca la revocación de la sentencia? Sobre esta cuestión la jurisprudencia está dividida. Un buen número de jurisdicciones sostienen que el conocimiento de los hechos que adquiere un jurado en una inspección ocular constituye evidencia y por consiguiente la inspección es parte del juicio y la presencia del acusado es indispensable y ni siquiera puede ser renunciada por él—*Noell* v. *Commonwealth of Virginia*

(1923) 135 Va. 600, 115 N. E. 679, 30 A.L.R. 134—citado por el apelante. Otras, no menos numerosas, encabezadas por la Corte Suprema de los Estados Unidos—*Snyder* v. *Mass.*, supra—, sostienen que los objetos físicos observados no son testigos, que el verdadero propósito de la inspección ocular es suministrar un medio de facilitar la apreciación de la prueba, y que por consiguiente la inspección no es una parte del juicio, y siendo ello así, el acusado no tiene derecho a estar presente, como tampoco lo tiene a presenciar la deliberación del jurado, y por lo tanto que la ausencia del acusado en persona durante la inspección ocular no infringe el debido proceso de ley garantizado por la Enmienda XIV de la Constitución. Véase al mismo efecto 6 Wigmore *on Evidence*, 3ª. ed., 1940, páginas 252 *et seq*.

Es justo consignar aquí que si bien la opinión en el caso de *Snyder* v. *Mass.*, supra, suscrita por el Juez Cardozo, sostuvo que el acusado no tiene derecho a estar presente en persona en una inspección ocular y que el privarle de ese privilegio no infringe la garantía del debido proceso de ley contenida en la Enmienda XIV de la Constitución Nacional, no es menos cierto que en la opinión disidente, suscrita por el Juez Roberts, en la cual concurrieron los Jueces Brandeis, Sutherland y Butler, se sostuvo que el negar al acusado el derecho a estar presente en persona durante la inspección ocular viola la Enmienda XIV, fundándose en que lo que el jurado observa en el curso de una inspección ocular constituye evidencia en el caso que no puede ser legalmente recibida en ausencia del acusado en persona.

Nuestro Código de Enjuiciamiento Criminal, en su artículo 179, prescribe que en un proceso por *felony* el acusado deberá asistir al juicio en persona, pero no tenemos precepto legal alguno dispositivo de que el acusado deba estar personalmente presente en la inspección ocular ni que el conocimiento que adquiera el jurado al celebrarla, constituya evidencia. Por consiguiente, debemos recurrir a la jurispruden-

cia para determinar la cuestión. Existiendo como existe una decisión de la Corte Suprema de los Estados Unidos sobre la materia, estamos obligados a seguirla y por lo tanto debemos resolver que el acusado no tiene derecho a estar presente en persona y que una inspección celebrada en su ausencia no infringe la garantía constitucional contenida en el artículo 2 de nuestra Ley Orgánica. No quiere esto decir que una corte deba negar ese privilegio a un acusado que lo solicita. Como dice Wigmore, obra y tomo citados, página 253, no debe suponerse que un juez en circunstancias ordinarias niegue ese privilegio a un acusado. A ese efecto debemos reproducir aquí lo dicho por nosotros en el caso de *El Pueblo v. Sarria,* 57 D.P.R. 882, 889:

"A nuestro juicio, la mejor práctica es permitir al acusado presenciar la inspección ocular a menos que existan razones poderosas para impedírselo, como, por ejemplo, cuando la vida del acusado corra peligro en caso de asistir a ella. Hallándose presente el acusado en la inspección ocular, puede llamar la atención a su abogado de cualquier error en que se incurra al mostrar el sitio o sitios en cuestión, y hacer a éste cualquier sugestión sobre cualquier punto o sitio que deba ver el jurado."

Pasemos ahora a la segunda cuestión a discutir en relación con el quinto señalamiento de error, a saber: ¿Se apartó la corte inferior del procedimiento establecido para una inspección ocular, lesionando los derechos sustanciales del acusado a tal extremo que requiera la revocación de la sentencia y la concesión de un nuevo juicio? No lo creemos así. Jorge Brandon, que a petición del jurado fué designado por la corte para mostrarle la escena del crimen, había declarado antes como testigo del fiscal y su declaración se contrajo al sitio donde él se hallaba cuando oyó el primer disparo, a la posición que ocupaban el acusado y la víctima, y lo que el testigo pudo presenciar a partir del primer disparo, habiendo sido repreguntado por la defensa en dicha ocasión. Al llegar al sitio de la inspección ocular fué puesto bajo juramento y gráficamente mostró al jurado la posición que

ocupaban la víctima y el testigo. En otras palabras, reprodujo lo que sobre el particular había declarado en presencia del acusado y de sus abogados. Nada nuevo oyeron de sus labios los señores del jurado que no hubieran oído de él en la sala de sesiones. Si bien se midió allí el tiempo que dicho testigo tardó en caminar de un punto a otro en la escena y declaró también que el sitio estaba alumbrado, esto en nada pudo afectar el veredicto, ya que todo ello resultaba completamente inmaterial, como tampoco pudo perjudicar al acusado el que el jurado viese dónde estaba situada la casa en que vivía Igaravídez para la fecha de su muerte. Además, el acusado y sus abogados, que tan celosos se muestran ahora de sus derechos, ¿por qué menospreciaron la oportunidad que repetidamente les brindó la corte para que participasen en la inspección ocular? No vemos cómo en un caso en que se imputaba un delito de asesinato en primer grado, en que estaba envuelta la libertad del acusado por todo el resto de su vida, se pueda haber demostrado tanta indiferencia por los llamados a velar por sus derechos. Somos de opinión que cualquier ligera desviación del procedimiento en lo que respecta a la inspección ocular no perjudicó los derechos sustanciales del acusado, y por consiguiente debemos concluir que no existe el quinto de los errores señalados.

El sexto señalamiento de error expone que el veredicto de asesinato en segundo grado no está sostenido por la evidencia presentada por El Pueblo.

Como cuestión previa, debemos consignar que el veredicto, de acuerdo con la ley, debe basarse en aquella parte de la evidencia tanto de cargo como de descargo que haya merecido crédito al jurado. Puede que la evidencia de El Pueblo por sí sola sea insuficiente, pero si la deficiencia es subsanada por la de descargo, el veredicto no debe ser alterado por ese solo motivo. De todos modos, en beneficio del acusado, vamos a asumir que lo que quiso alegar la defensa fué que el veredicto es contrario a la evidencia.

El Fiscal de este tribunal hace en su alegato una exposición fiel de la prueba tanto de cargo como de descargo, por lo que la hacemos nuestra y transcribimos a continuación:

"La prueba presentada por el fiscal consistió de la declaraciones de los testigos Dr. Alvaro Santaella, Rafael Torruellas Cortada, Carlos Cuesta, Miguel Angel Ríos, Jorge Brandon, Humberto Cartagena, Miguel Alfonso, Eulogio Rivera, Coronel Enrique de Orbeta, el Juez Jorge Bartolomei, Rafael Molina, Juan M. Tusel, Jorge Rivera y el Capitán Salvador G. López de Azúa, ofreciéndose también además de las declaraciones de estos testigos un revólver y cuatro balas sin disparar, con dos balas disparadas, ocupado al acusado; una caja de dientes postizos que usaba el interfecto y un papel escrito por el testigo Miguel Alfonso con relación a dicha pieza de evidencia; un revólver Colt y 6 balas sin disparar que era el revólver de reglamento del Capitán Rafael Igaravídez y que apareció en la gaveta superior derecha de su escritorio bajo llave; la placa y gorra, la primera del policía y la segunda del Capitán Igaravídez; dos plomos encontrados en el sitio de los sucesos inmediatamente después de los disparos; un pañuelo de hombre, color verde, dos cigarros, un billete de la lotería extraordinaria correspondiente al mes de julio de 1938; un reloj, unos lentes, una caja de fósforos y una libreta de cheques, todo perteneciente al Capitán Igaravídez y que tenía esa noche sobre su persona; el gabán o chaqueta y el pantalón, la camisa y ropa interior que vestía esa noche el interfecto; el pliego de cargos presentado por el Capitán Igaravídez contra el acusado, por falsedad, el mismo día de la ocurrencia de los hechos, a las 6 P. M.; y un diagrama hecho en una pizarra por uno de los testigos de cargo. Además, se presentó por el fiscal prueba de *rebuttal* consistente de las declaraciones del sargento José A. Rodríguez y Jefe Rafael Molina y Capitán López de Azúa, y un memorándum del interfecto identificado por el sargento Rodríguez y relacionado con los cargos de falsedad formulados al acusado por el interfecto.

" . . . . . . .

(de dicha prueba resulta)

"Que el acusado Ramón Cruz Reyes para la fecha de la ocurrencia de los hechos, o sea el 29 de junio de 1938, y desde varios meses antes, desempeñaba el cargo de policía insular en la ciudad de Ponce, bajo las órdenes del interfecto, Capitán Igaravídez; que días antes de ocurrir el suceso, el Capitán Igaravídez había formulado al acusado un cargo por abandono de servicio, consistente en que el día 15 de junio de 1938, siendo dicho acusado el encargado de la vigi-

lancia diurna de la demarcación denominada 'Atocha y Vivès', de la ciudad de Ponce y estando en horas de servicio, o sea a las 5 P.M., fué sorprendido por el Jefe Igaravídez en tertulia con un paisano y sin asumir la posición (*exhibit* 10 de El Pueblo), cargo éste por el cual fué condenado el acusado a pagar dos dólares de multa y reprensión de orden general; que el mismo día 15 de junio ya indicado, el acusado hizo una anotación al folio 210 del Libro Auxiliar de Novedades de la Policía, a las 6:25 P.M., informando que ese mismo día a las 5:00 P.M. Antonio Santiago Rodríguez le había comunicado que mientras tenía su automóvil parado en la esquina de la calle Atocha le hurtaron del asiento del mismo un par de zapatos, valorado en $5.50, y que no tenía sospecha de persona alguna, cuyo informe resultó falso, según la investigación practicada; que con motivo de esa actuación del acusado, el Capitán Igaravídez le formuló un nuevo cargo de falsedad a este acusado, cuyo cargo le fué notificado con copia exacta el mismo día 29 de junio de 1938, a las 6:00 P.M., concediéndosele un término de 48 horas para que interpusiera su defensa, de acuerdo con lo dispuesto en las órdenes y Reglamentos de la Policía Insular; que esa misma noche, entre ocho y ocho y media de la noche salió de su casa, sita en la calle León el Capitán Igaravídez dirigiéndose hacia la calle Isabel; que al llegar a esta última calle dobló hacia la derecha en dirección Oeste, o sea, hacia la Plaza Muñoz Rivera, cruzando luego frente al edificio de la National Printing Press de la acera derecha a la acera izquierda, en forma diagonal, llegando por dicha acera a la esquina que forman las calles Atocha e Isabel, frente al establecimiento de la droguería o farmacia Royal; que el Capitán Igaravídez caminaba despreocupadamente fumando un tabaco y vestía su uniforme azul de capitán de la policía; que en los momentos en que llegaba a la esquina antes indicada caminó hacia él el acusado Ramón Cruz Reyes y al verlo el Capitán Igaravídez le saludó diciéndole: '¿Qué hay?'. Que la respuesta del acusado fué hacerle un disparo con su revólver de reglamento, disparo éste que entró por la región pectoral izquierda causándole una herida en el tórax y perforando la bala en su trayectoria la base del pericárdeo, del lóbulo del pulmón izquierdo, del diafragma y el estómago, produciendo en este último órgano dos perforaciones, una de entrada y otra de salida, hiriendo luego el bazo y saliendo, finalmente, al exterior por la región corto-ilíaca izquierda en el séptimo espacio intercostal; que al recibir ese balazo se desplomó el Capitán Igaravídez cayendo a lo largo de la acera en cuyo momento se acercó más el acusado a su víctima haciéndole un segundo disparo por la cabeza que le penetró por la región

temporal izquierda y le salió por la región parietal derecha, fracturándole y destruyendo a su paso los huesos temporal y parietal y la masa cerebral, causándole una hemorragia cerebral interna, al igual de la primera herida le causó una hemorragia torácica aguda, que le produjo la muerte a los pocos minutos. Una vez realizado su propósito y luego de amenazar al policía Ríos que intenta acercársele en esos instantes de que no se le acerque, toma un carro en unión a dicho policía Ríos, quien lo conduce bajo arresto a la cárcel de distrito ocupándole el revólver con cuatro cápsulas sin disparar y dos disparadas. El Capitán Igaravídez no tenía armas de clase alguna sobre su persona según quedó demostrado por la prueba del fiscal, pues ni en el sitio de los sucesos ni luego al ser registrado por el Dr. Picó por órdenes del Juez Municipal Bartolomei, se ocupó arma alguna, ni siquiera funda o vaqueta, demostrando también la prueba que el Capitán Igaravídez generalmente no usaba revólver; hecho éste que quedó demostrado al encontrarse su revólver de reglamento por el Jefe de la Policía Insular, Coronel Enrique de Orbeta, en una de las gavetas de su escritorio en su oficina en el cuartel bajo llave; que del sitio donde cayó el cuerpo del Capitán Igaravídez, en medio de un charco de sangre, en cuyos alrededores se encontraron objetos de su uso personal, tales como su dentadura postiza y el tabaco que fumaba en los momentos de la agresión, fué llevado a la Clínica donde falleció a los pocos minutos.

"La prueba del acusado consistió en las declaraciones del chófer de uno de los testigos de cargo, don Rafael Torruellas, a fin de impugnar la credibilidad de su patrono; Miguel Álvarez, uno de los fiadores del acusado, quien salió en comisión por la isla a recoger dinero a favor de éste y cuyo testimonio tendió en parte a impugnar la credibilidad o contradecir más bien al testigo Brandon del fiscal; de Edelmiro Colón, expolicía a quien según la prueba de *rebuttal* del fiscal el Capitán Igaravídez le formuló en una ocasión cargos por desobediencia de órdenes y quien de rango de Lance Corporal fué degradado a simple guardia y trasladado de Ponce al pueblo de Arroyo, por cuyo motivo renunció; de José A. Rivera, chófer del anterior testigo Edelmiro Colón; del expolicía Ángel Tilano Maldonado, quien fué destituído por la Comisión de la Policía por cargos que contra él formuló el Capitán Igaravídez, y el testimonio del propio acusado, en adición del del Capitán López de Azúa. Dicha prueba de defensa tendió a demostrar que entre el Capitán Igaravídez y el expolicía Angel Maldonado había ocurrido un disgusto por motivo de ciertos cargos contra él formulados y cierta actitud ofensiva del

Capitán Igaravídez por cuyo motivo se habían desafiado; que eso había ocurrido dos días antes de la muerte de Igaravídez estando allí presente también el acusado Cruz Reyes; que la noche de los sucesos, mientras esperaba el acusado un automóvil para que lo llevara a su casa, vió al Capitán Igaravídez en la esquina de la droguería Royal y caminó hacia ese sitio; que al acercarse a Igaravídez éste lo agarró y le dijo: 'Ah, Maldonado,' a lo cual respondió el acusado Cruz Reyes: 'Yo no soy Maldonado,' diciéndole entonces Igaravídez: 'No me hable,' y haciendo un *aguaje* para meterse la mano 'aquí', o sea, como un ademán hacia la parte derecha de la región abdominal; que entonces el acusado reproduciendo en su mente en forma rápida la escena ocurrida en el cuartel en que se desafiaron de muerte Igaravídez y Maldonado y asociando a ello la frase 'Ah, Maldonado,' temió ser objeto de agresión por parte de Igaravídez y entonces sacó su revólver haciéndole dos disparos; que él creía que estaba armado; que el primer disparo fué por el pecho y el segundo lo hizo el acusado cuando Igaravídez lo agarraba por una pierna.'' (Paréntesis nuestro.)

De los hechos expuestos resulta que no hubo controversia alguna en cuanto a que el acusado dió muerte a Rafael Igaravídez. La discrepancia entre una y otra prueba consiste en que según el acusado él actuó en defensa propia. El jurado apreció la prueba de una y otra parte y no dió crédito a la referente a la defensa propia, desde el momento que trajo un veredicto de asesinato en segundo grado, y no vemos que al así apreciar la evidencia haya incurrido en error, y como dicha evidencia sostiene perfectamente el veredicto rendido, procede declarar que tampoco existe el alegado error.

 Finalmente, alega el apelante como octavo y último error que la pena de diez y siete años de presidio que le fué impuesta es excesiva y se queja de que el juez no tomara en consideración la recomendación de clemencia que le hiciera el jurado. Descartada la defensa propia, como necesariamente lo fué al rendirse un veredicto de asesinato en segundo grado, el resto de la evidencia claramente demuestra que el delito cometido fué el de asesinato en primer grado, castiga-

ble con cadena perpetua. Que el juez tomó en consideración la recomendación del jurado, lo demuestra el haberle impuesto solamente diez y siete años de presidio, cuando las circunstancias del delito justificaban el máximo de la pena, que tratándose de un asesinato en segundo grado es de treinta años de presidio.

*No existiendo tampoco el último de los errores señalados, procede, por lo expuesto, la confirmación de la sentencia.*