EL PUEBLO DE PUERTO RICO, apelado, *v.* ADELINO PAGÁN DÍAZ, acusado y apelante.

*Número:* CR-80-63      *Resuelto:* 27 de octubre de 1981

*Carmen Ana Rodríguez Maldonado*, de la Sociedad para Asistencia Legal, abogada del apelante (en apelación solamente); *Héctor A. Colón Cruz, Procurador General*, y *Lirio Bernal, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

La solución del recurso exige la evaluación de dos aspectos, a saber: (1) si el tribunal de instancia debió ordenar una inspección ocular del lugar donde ocurrieron los hechos; y (2) si la culpabilidad del acusado apelante fue probada más allá de duda razonable.

El apelante Pagán Díaz fue acusado de asesinato en primer grado e infracciones a los Arts. 6 y 8 de la Ley de Armas. Un jurado rindió veredicto de culpabilidad por el asesinato y el Art. 8 de la Ley de Armas y el tribunal lo declaró culpable de la infracción al Art. 6. Fue sentenciado a cadena perpetua por el asesinato y a otras penas por los restantes delitos. Ante nos plantea la insuficiencia de la prueba. Resumámosla.

I

Como testigos de cargo declararon el patólogo Mariano Sorvill y Ramón Rivera Rodríguez. Se estipuló el testimonio de Juan Cosme Figueroa como la persona que iden-

tificó el cadáver de Wilmer Nieves Segarra. La declaración total del doctor Sorvill, quien practicó la autopsia, demostró que la causa de la muerte fue un severo trauma cráneo-cerebral a consecuencia de una herida de bala en el cráneo. Indicó, además, que el cuerpo del occiso recibió cuatro impactos de bala por el frente y ninguno por la espalda. Que debió caerse al suelo inmediatamente y que su cuerpo y ropa *no* reflejaban que hubiese sido arrastrado. Indicó también que el occiso no tenía marca o raspadura alguna en el cuello.

*Ramón Rivera Rodríguez* manifestó que el día 15 de abril de 1979 residía en el Residencial Las Margaritas, Edif. Núm. 1, cuarto piso. Señaló que estaba casado, no tenía hijos y que estudió hasta cuarto grado. Que en esa fecha, como a las siete de la noche, cuando estaba obscureciendo, se encontraba parado frente a la ventana del cuarto de su apartamiento cuando vio a Wilmer (el occiso) llegar en un auto y estacionarlo detrás de su apartamiento. Que luego éste se dirigió hacia la casa de Mary. Que allí se encontraban todos los hijos de ella y también estaban Coso y Jockey (el apelante). Señaló que luego de Wilmer hablar con Mary y cuando se dirigía hacia su carro, Coso, quien iba caminando detrás del occiso, lo llamó. Que vio cuando Wilmer hizo morisquetas con las manos y Coso sacó un arma de su cintura y le hizo cuatro disparos. Que Wilmer cayó, Coso se montó en el carro de Wilmer y Jockey vino, le registró los bolsillos del pantalón al occiso, y le arrancó la cadena del cuello.

Se presentaron en evidencia por el Ministerio Público tres fotos, marcadas como *Exhibits* I, II y III del Pueblo. El testigo identificó en las mismas el cadáver del occiso y *el lugar donde cayó el cuerpo*. Continuó declarando que Coso se fue en el auto de Wilmer mientras que Jockey caminó para la casa de Mary. Que todo esto ocurrió como a *veinte pies de donde él se encontraba* y que esa noche volvió a ver a Coso y a Jockey en casa de Mary. Señaló,

además, que conocía a Coso hacía tiempo y a Jockey hacía cuatro años. Indicó que fue luego de los hechos ocurridos ese día que se enteró que el nombre de Coso es Luis Noble Fuentes y el de Jockey, Adelino Pagán Díaz.

En el *contrainterrogatorio* manifestó que hacía diez años que vivía en el residencial y conocía bien el área. Que la noche de los hechos se encontraba junto a su esposa en el apartamiento y ella se asomó a la ventana cuando se oyeron los disparos. Que ambos permanecieron en el apartamiento toda la noche. Se reiteró en que el cadáver cayó *frente a su apartamiento como a veinte pies y que la iluminación en el lugar era bastante buena.* Declaró que el cadáver *se quedó en el mismo lugar hasta que llegó la Policía.* Que esa noche no bajó a hablar con la Policía y no fue hasta dos días después que habló con ella. Indicó que no vio en ningún momento que Wilmer le diera las llaves del auto a Coso. Por otro lado, no pudo describir el arma con que se hicieron los disparos, señalando que no sabía si era un revólver o una pistola. Manifestó, además, que sólo conocía a Wilmer de vista y que cuando lo mataron vestía una camisa con rayas, mientras Jockey tenía pantalones obscuros. *Reiteró que los disparos fueron de frente.*

Declaró, además, que él no le había entrado a tiros al acusado dos o tres días antes de ocurrir los hechos. Negó haber declarado en la vista preliminar que fue en casa de Tarzán que vio a Jockey y a Coso antes de los hechos.

La defensa le solicitó que fuera a la pizarra y dibujara el edificio donde él residía y los que le quedaban a su alrededor. No logró hacerlo. La defensa solicitó al tribunal *una inspección ocular* del área, ya que resultaba *imposible que desde el apartamento del testigo éste viera donde cayó el cadáver y cómo ocurrieron los hechos, pues de por medio y exactamente frente a su apartamento quedaba el Edificio Núm. 47 y fue detrás de ese edificio donde cayó el cadáver.* Dicha solicitud fue denegada por el tribunal de instancia.

La defensa confrontó al testigo con su declaración en la

vista preliminar ante la Hon. Juez Luz H. Carrasquillo. Se le preguntó si en aquella ocasión él manifestó que la noche de los hechos, luego de los disparos, él se fue para casa de sus tíos, si recordaba haber declarado que los disparos fueron de espalda, si recordaba haber testificado que no sabía cómo estaban vestidos Wilmer y Jockey y haber manifestado que él era amigo de Wilmer. Si recordaba haber testificado que esa noche no volvió a ver a Jockey ni a Coso, y que donde los había visto era en casa de Tarzán y no en casa de Mary. *El testigo negó haber declarado todo lo anterior* durante la vista preliminar.

Terminado el Ministerio Público, la defensa presentó su prueba consistente de los testimonios de la Hon. Juez Luz H. Carrasquillo, el policía Pablo R. Ortiz, la señora María M. Nieves y el Lic. Fernando Carlo Gorbea.

La Hon. Juez Carrasquillo declaró que fue ella quien presidió la vista preliminar contra el acusado Adelino Pagán Díaz. Señaló que recordaba que el Sr. Ramón Rivera Rodríguez declaró como testigo principal del Ministerio Público y que éste declaró que todos los disparos habían sido de espalda, que no sabía cómo estaba vestido Wilmer, a quien el testigo llamó todo el tiempo como Moto, ni cómo estaba vestido Jockey. Que declaró, además, que Wilmer y él eran amigos y que Coso y Jockey antes de los disparos se encontraban en casa de Tarzán. Señaló, además, la testigo, que recordaba que el señor Rivera declaró que cuando mataron a Wilmer él bajó con cuidado y se fue para la casa de sus tíos solo. Indicó, además, que el testigo no había declarado que volviera a ver ese noche ni a Coso ni a Jockey.

A preguntas del Ministerio Público, la Juez Carrasquillo manifestó que aunque había tomado notas en la vista preliminar, no se había refrescado la memoria ni las tenía consigo en el tribunal. Que recordaba lo declarado en la vista preliminar porque fue una de las últimas que había presidido antes de que se le asignara la Sala de lo

Civil y que además la recordaba, ya que en la etapa final de la vista, cuando ella determinó que no había causa probable, ésta se celebró en la Sala de lo Civil y no en el Salón de Vistas Preliminares. Manifestó que no recordaba cuántas vistas había celebrado ese día, pero que se acordaba de esa en particular porque había durado varios días.

*Pablo Ortiz* declaró su condición de agente de la Policía asignado a los sectores 445, 448 y 449 del área de Barrio Obrero. Que el día de los hechos, como a las 7:30 de la noche se personó al Residencial Las Margaritas, Edif. Núm. 47, con motivo de haber recibido una querella de asesinato. *Indicó que conocía bien el sector, pues llevaba tiempo asignado al mismo.* Manifestó que vio el cadáver esa misma noche y estuvo a cargo de su custodia y de la investigación del área.

La defensa le presentó dos fotos marcadas posteriormente como *Exhibits* II y III de la defensa. *El testigo manifestó que dichas fotos reflejaban el lugar donde estuvo el cadáver.* Que en una de las fotos se veía el sitio *de cerca*, mientras que frente a donde se encontraba el cadáver había una plazoleta con bancos y en la parte posterior de ese edificio quedaba el Edif. Núm. 1. Se le confrontó con el *Exhibit* I del Pueblo, donde aparecía el cadáver en el suelo, y declaró que ese *era el mismo lugar donde estaba el cadáver*. Señalando que detrás del edificio donde estaba el cadáver quedaba el Edif. Núm. 1 *y que no se podía ver del Edif. Núm. 1 dónde estaba el cadáver, porque de por medio se encontraba el Edif. Núm. 47*. Examinó el *Exhibit* I de la defensa y dijo que en dicha foto *no* aparecía el lugar donde se encontraba el cadáver y que se podía observar el Edif. Núm. 1 y de frente el Edif. Núm. 47.

En esta ocasión se volvió a solicitar una inspección ocular y la misma nuevamente fue *denegada*.

En el contrainterrogatorio, a preguntas del Ministerio Público, el agente Ortiz declaró que había entrado al

Residencial en el carro patrulla por la calle que hay entre los edificios Núm. 1 y Núm. 47. Señaló que no fue a la casa del testigo Ramón Rivera Rodríguez ni se asomó por la ventana trasera del apartamiento de éste. Indicó que el Edif. Núm. 1 tiene cuatro pisos y que pasó entre ambos edificios. En el redirecto manifestó que tamb́ien el Edif. Núm. 47 tiene cuatro pisos.

*María Nieves* declaró que reside en el Edif. Núm. 44, apartamento 689, Residencial Las Margaritas. Que conoce a Ramón Rodríguez, conocido por Pocholo, porque su suegra vive por allí y por haberlo visto en el Residencial en muchas ocasiones. Indicó que también conoce a Adelino Pagán Díaz conocido como Jockey por haberlo visto en el Residencial, pero que no tenía amistad ni con él ni su familia.

Manifestó que el 13 de abril de 1979 vio cuando Pocholo le entró a tiros a Jockey en la escuela Fray Bartolomé de las Casas, que queda frente a su apartamento, y que Jockey echó a correr. Indicó que el 15 de abril de 1979, día de los hechos que motivan el caso de epígrafe, se encontraba en la cocina cuando escuchó unos disparos y vio donde se encontraba el cadáver. Que el cadáver estaba *frente a su edificio, y frente a donde cayó el cadáver había una placita con bancos, por lo que era imposible que una persona que estuviese en el Edif. Núm. 1 viera el cadáver, ya que por medio estaba el Edif. Núm. 47.*

A preguntas del Ministerio Público indicó que no sabía dónde vivía Jockey. Señaló que el revólver con que Pocholo le disparó a Jockey era negro y pequeño. Que cuando Pocholo le disparó a Jockey eran alrededor de las ocho de la noche, pero que ella no dijo nada a la Policía ya que eso no era asunto de ella. Que no sabe si acusaron a Pocholo, que nunca ha hablado con la Policía y que está en el Tribunal hoy declarando porque está citada por la corte.

A solicitud del Hon. Juez Álvarez de la Vega la testigo señaló a Pocholo y luego señaló e identificó a Jockey.

El Lic. Fernando Carlo Gorbea declaró que el 21 de agosto de 1980 era un jueves y tenía un caso de Sustancias Controladas en el Tribunal. Que en el receso fue a la cafetería donde estuvo con el Fiscal Colón Crescioni, el Sr. Willy Barreto, el Lic. Félix Guardiola y el Sr. Ramón Rivera Rodríguez (Pocholo). Señaló que este último se sentó a su lado y al lado del licenciado Guardiola. Que Pocholo dijo allí en la cafetería, refiriéndose al caso contra Jockey, que a él lo habían arrestado en el corral de las guaguas una noche con un arma de fuego y que unos agentes se lo habían llevado. Que los agentes lo habían amenazado con que si no declaraba lo que había dicho en su declaración jurada en relación con el caso de Jockey le iban a someter un caso de armas contra él, indicando que lo obligaron a declarar lo que decía en su declaración jurada. Indicó el testigo que el señor Rivera no dijo que lo que estaba en su declaración jurada era falso, pero sí que la Policía lo obligó a sostener lo que allí había dicho.

A preguntas del Ministerio Público manifestó el testigo haber sido abogado-jefe de la Sociedad para Asistencia Legal. Indicó que el Lic. Félix Guardiola, abogado del acusado, tuvo el caso de éste desde la vista preliminar donde se determinó que no había causa probable, pero que no recuerda si fue él quien le asignó el caso al licenciado Guardiola. Señaló además, que no recuerda que representara al acusado en alguna ocasión, pero sí sabe que nunca lo había representado en los méritos.

Se admitieron en evidencia en dicho momento y con el consentimiento de la defensa unas citaciones relacionadas con el acusado donde aparece el nombre del licenciado Carlo. Al serle mostradas dichas citaciones al testigo, éste manifestó que él aparecía en las mismas porque él era el jefe de la Sociedad para Asistencia Legal, pero que no recordaba tan siquiera haberle asignado el caso al licenciado Guardiola y que la única ocasión que discutió el caso

del acusado fue el día que Pocholo hizo la manifestación antes aludida.

En el redirecto el testigo explicó al tribunal que se acostumbra citar al abogado-jefe de la Sociedad para Asistencia Legal y que es a través de él que se le hacen llegar las notificaciones al abogado que está a cargo del caso.

Como prueba de refutación se estipuló el testimonio del Fiscal Fernando Colón Crescioni a los efectos de que el 21 de agosto de 1980, estando presente en la cafetería el licenciado Guardiola, el señor Barreto, el licenciado Carlo y él mismo, se les acercó una persona llamada Pocholo y que dirigiéndose al grupo dijo que para ayudar a los muchachos que son amigos iba a decir cuando se sentara a declarar que la Policía lo obligó a declarar lo que dice la declaración jurada y que los hechos no ocurrieron como aparecen allí, pero que vio cuando le dispararon y mataron a Wilmer. Que entonces el licenciado Guardiola le manifestó a Pocholo "lo que acabas de decir lo has dicho delante de este señor que es Fiscal refiriéndose al Fiscal Colón Crescioni".

## II

Del resumen que antecede de la declaración del testigo de cargo, Ramón Rivera Rodríguez, y de las declaraciones de los testigos de la defensa, el policía Pablo R. Ortiz y María M. Nieves, se desprende que hubo una seria e importante contradicción. Estos dos últimos atestaron dónde se encontraba el cadáver y que desde ese sitio *no* se podía ver desde el Edif. Núm. 1 porque de por medio se encontraba el Edif. Núm. 47.

Dicha contradicción giraba en esencia sobre la declaración del único testigo ocular de cargo. Su versión había sido impugnada por una persona sin interés alguno, como lo era el policía Pablo R. Ortiz. Adviértase, además, que el patólogo había declarado que el occiso debió caerse al suelo *inmediatamente* y que *su cuerpo y ropa no reflejaban*

*que hubiese sido arrastrado.* Por otro lado, ese testigo de cargo no pudo dibujar e ilustrar en la pizarra el sitio donde residía hacía diez años y algunos detalles básicos de sus alrededores. En esas circunstancias el juez de instancia debió conceder la inspección ocular solicitada en dos ocasiones por la Defensa. Veamos.

■ Sabido es que las inspecciones oculares no tienen otro propósito que auxiliar al jurado o al juez a apreciar correctamente la prueba que haya desfilado o que se proponga desfilar. *Pueblo* v. *Cruz,* 60 D.P.R. 116 (1942). La actual Regla 134 de Procedimiento Criminal, en lo pertinente dispone que "Cuando en la opinión del tribunal fuere conveniente que el jurado examine el lugar en que fue cometido el delito, o en que hubiere ocurrido cualquier otro hecho esencial, podrá ordenar que se conduzca al jurado" a dicho sitio para una inspección ocular.

■ Ciertamente el ordenar una inspección ocular es una facultad que cae dentro de la sabia discreción del Tribunal. El discernimiento judicial que debe preceder tal determinación exige la evaluación inicial de dos condiciones: (a) el tribunal debe constatar y velar porque el lugar a ser examinado se halle sustancialmente en las mismas condiciones que cuando se cometió el delito —*Pueblo* v. *Díaz,* 91 D.P.R. 146 (1964); *Pueblo* v. *Cruz,* supra; *Pueblo* v. *Sarria,* 57 D.P.R. 882 (1941); y *Pueblo* v. *Goitía,* 41 D.P.R. 941 (1931)—; y (b) debe medir la necesidad real, su pertinencia y el esfuerzo que ello conlleva. Como medio de prueba —*Emanuelli Fontánez* v. *Emanuelli Suro,* 87 D.P.R. 380 (1963)— la inspección puede ser pertinente, pero su valor probatorio de poca significación en relación con cualesquiera de los siguientes factores: peligro de causar perjuicio indebido, probabilidad de confusión, desorientación del jurado, dilación de los procedimientos o innecesaria presentación de prueba acumulativa. Regla 19 de Evidencia.

Es con referencia a estas pautas que hemos concluido

que el tribunal erró al no acceder a la inspección ocular. Advertimos no sólo la contradicción esencial en el testigo ocular de cargo, sino que no se demostró que las circunstancias del lugar de los hechos, al momento del juicio, hubieren variado drásticamente. Su concesión no hubiese causado confusión al jurado, pues tan solo tenían que examinar y determinar unos hechos sencillos: (a) la localización de la residencia del testigo de cargo; (b) si el Edif. Núm. 47 quedaba de por medio a dicha residencia; (c) el lugar en que se encontraba el cadáver; y (d) si era susceptible de ser observado desde el apartamento en el Edif. Núm. 1.

No podemos, por tanto, decir que dicha inspección ocular pudiera causar peligro indebido, desorientación al jurado, dilación de los procedimientos o innecesaria presentación de prueba acumulativa. Todo lo contrario: hubiera despejado de manera objetiva cualquier duda sobre la veracidad de los testimonios en conflicto.

### III

■ Ahora bien, aunque de los autos no surgen las razones para el tribunal sentenciador haber negado la inspección ocular, es posible que dicho foro estimara suficiente prueba para adjudicar credibilidad las fotografías en evidencia. Por su naturaleza documental estamos en las mismas condiciones de constatar y comprobar la veracidad de lo declarado en cuanto al aspecto de la localización geográfica del Edif. Núm. 1, el Núm. 47, la escena del crimen y áreas susceptibles de percepción visual por el supuesto testigo ocular de cargo.

En autos obran seis fotografías admitidas en evidencia (tres del Pueblo y tres de la Defensa). Describámoslas en detalle. El *Exhibit* I del Pueblo presenta al occiso boca arriba con pantalones obscuros y camisa a cuadros de manga larga. A su lado izquierdo hay una verja de alambre eslabonado (*cyclone fence*), la cual se encuentra caída

de un lado. El occiso aparece en un terreno que presenta unos matojos en crecimiento. El *Exhibit* II también del Pueblo presenta una toma más cercana del cadáver. Aquí ya se ve que los dos bolsillos del pantalón están fuera, o como se dice comúnmente, al revés. La camisa en esta ocasión se encuentra abierta, y se nota en el costado derecho una aparente herida de bala. El *Exhibit* III del Pueblo es más ilustrativo por presentar una perspectiva más amplia. La foto fue tomada del lado izquierdo del occiso, por tanto, primero físicamente se encuentra la verja de alambre y luego el occiso. Se puede apreciar que en realidad existen dos tipos de verja, la de alambre eslabonado (*cyclone fence*) y otra de alambre a cuadros como de cuatro pulgadas cuadradas. La verja de alambre eslabonado tiene una altura aproximada de dos pies y la otra como de cuatro pies. Al fondo, como a una distancia de ocho a diez pies se encuentra localizado un edificio con tres ventanas abiertas y al frente de las ventanas se encuentran unos arbustos y una mata grande de guineos. Aparecen, además, dos agentes de la Policía uniformados y numerosos curiosos.

Los *Exhibits* de la defensa son desde otro ángulo. El *Exhibit* I presenta parcialmente tres edificios, números 1, 47 y 46. La foto refleja la parte posterior del Edif. Núm. 1 y gran parte del frente del Edif. Núm. 47 y una parte del 46. El testigo de cargo Rivera Rodríguez vive en el Edif. Núm. 1, y es desde la ventana de su cuarto que dice que vio lo que sucedió (la ventana no se ve en la foto). El frente del Edif. Núm. 47 aparece muy claro. En la parte central del frente se ven gran cantidad de arbustos, varias matas de guineos y una verja en buenas condiciones de alambre eslabonado (*cyclone fence*). No se ven por ningún lado las verjas que se aprecian en los *Exhibits* del Pueblo. Si examinamos el *Exhibit* III de la Defensa, podemos notar que es la parte trasera del Edif. Núm. 47. A los fines de poseer una perspectiva integral, hemos combinado los *Exhibits* I y III de la Defensa de forma horizontal, según el Apéndice I

unido a esta ponencia. *Infra*, pág. 623. Observamos así que el lado derecho del *Exhibit* III es idéntico al izquierdo en el *Exhibit* I. Las ventanas que posee el Edif. Núm. 47 en dicho lado (de frente al edificio sería el lado izquierdo) son exactamente idénticas. En el *Exhibit* III —que presenta la parte posterior del Edif. Núm. 47— se pueden apreciar claramente las dos verjas que aparecían en los *Exhibits* I y III del Pueblo, las tres ventanas, la mata de guineos y los arbustos. También se aprecia en este *Exhibit* III una especie de plazoleta que está detrás del Edif. Núm. 47.

Al examinar el *Exhibit* II, también de la Defensa, —Apéndice II— y compararlo con el *Exhibit* III del Pueblo percibimos que se trata del mismo lugar. Este *Exhibit* II de la Defensa establece indubitadamente que el occiso tenía que estar detrás del Edif. Núm. 47 y no en el frente como dice el único testigo de cargo. Hay que señalar también que en el *Exhibit* III del Pueblo se pueden ver dos policías uniformados, uno de ellos con rango de sargento. En otras palabras, no hay duda de que la escena del crimen fue la parte posterior del Edif. Núm. 47 y la ubicación que hace el testigo de cargo Rivera Rodríguez no solo es incorrecta, sino que lo sitúa en su apartamento desde el cual físicamente le era imposible ver cómo ocurrió el asesinato. *Forzoso es concluir que lo declarado por él es falso.* Ello explica, tal vez, por qué su declaración está plagada de cambios y contradicciones. (1)

_____

(1) La declaración de la Hon. Juez Carrasquillo tachó la veracidad del testigo. En la vista preliminar declaró que los tiros fueron por la espalda y en el juicio dijo que habían sido de frente. Atestó que no sabía cómo estaba vestido el occiso, y en el juicio dijo que tenía camisa de cuadros (lo vio en la foto). Que se había ido esa noche después de los tiros para casa de sus tíos *solo*, en el juicio dijo que se había quedado toda la noche en su casa. Por otro lado negó expresamente que hiciera unos días antes algunos disparos al acusado. La testigo María M. Nieves expresamente contradijo esa aseveración al declarar que el 13 de abril de 1979 vio cuando dicho testigo le entró a tiros al acusado por la escuela Fray Bartolomé de las Casas, escuela que queda frente a su apartamento y que este último echó a correr. Sobre estos hechos describió el arma y la hora del suceso. De las fotografías claramente se desprende que es imposible decir que entre el lugar en que estaba el testigo de cargo y donde él dice que cayó el cadáver, lo cual dijimos es falso, hubiera 20 pies.

■ Ante estas circunstancias, las sentencias condenatorias no pueden sostenerse, pues infringen el precepto constitucional de que todo acusado tiene derecho a gozar de una presunción de inocencia. Art. II, Sec. 11. Esta "[a]bstracción jurídica ésta que toma cuerpo y realidad práctica a través de la norma de ley de que a todo acusado se le deberá probar su culpabilidad más allá de duda razonable y fundada, y si hubiere duda razonable en cuanto a ella, se le deberá absolver". *Pueblo* v. *Ortiz Morales*, 86 D.P.R. 456, 466 (1962). Regla 110 de Procedimiento Criminal. La determinación de si se ha probado la culpabilidad más allá de duda razonable es, pues, revisable como cuestión de derecho. *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56, 60 (1966).

Reconocemos que los jueces de instancia y los jurados son quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos. Por ende, la apreciación que ellos hagan merece gran respeto —*Pueblo* v. *Nevárez Virella*, 101 D.P.R. 11 (1973)— y la adjudicación de credibilidad y el dictamen de un caso sólo será alterado ante parcialidad o error manifiesto en la adjudicación de la prueba. *Pueblo* v. *López Ramos*, 96 D.P.R. 699, 703 (1968); *Pueblo* v. *Iturrino De Jesús*, 90 D.P.R. 706, 712 (1964); *Pueblo* v. *Aponte González*, 83 D.P.R. 511, 520 (1961). Ello no significa que los juzgadores de instancia están inmunes al error. *Pueblo* v. *Carrasquillo Carrasquillo*, 102 D.P.R. 545, 551 (1974). El caso de autos es uno de ellos.

■ El Procurador en su Informe nos señala que la declaración del testigo Rivera Rodríguez probó, mediante evidencia directa, la comisión del delito por el apelante y como *testigo ocular* que mereció crédito al jurado, debemos respetar su dictamen. Esa tesis pasa por alto que la evidencia presentada por la Defensa, confirmada por nosotros, demostró clara y precisamente dos cosas: *que el testigo de cargo no fue un testigo ocular, o que siéndolo prestó un testimonio inverosímil y físicamente imposible.*

Es oportuno recordar el pronunciamiento expuesto en *Pueblo* v. *Carrasquillo* supra, págs. 551–552:

*Hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila.*

Cuando de aquilatar la prueba se trata es difícil a veces trazar una línea demarcadora entre cuestiones de hechos y cuestiones de derecho. Las pruebas son hechos pero su análisis pone en movimiento, además de la experiencia del juzgador, su conocimiento del Derecho para así llegar a una solución justa de la controversia. Ese proceso analítico tiene que estar enmarcado en casos penales en el principio fundamental de que la culpabilidad del acusado debe ser probada más allá de duda razonable. Esa prueba, además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación. (Énfasis suplido.)

*Se dictará sentencia revocando las del Tribunal Superior, Sala de San Juan y absolviéndose al acusado.*

El Juez Asociado Señor Díaz Cruz concurre en que fue error perjudicial negar la inspección o reconocimiento judicial pedido por la defensa, mas el error no justifica la absolución, sino un nuevo juicio en que el jurado tenga el beneficio de observar la posición de los edificios en relación con el sitio donde cayó la víctima, y pueda el Tribunal comparar la realidad física del sitio, con la que ofrecen las fotos de defensa. En pocos casos como éste puede la inspección ocular dejar la conciencia satisfecha de que alcanzó la verdad.

(CR-80-63)
**APENDICE I**

Ed. 1

Edificio 47
(Vista del Frente)

Edificio 47
(Vista Parte Posterior)

APARTAMENTO DEL
TESTIGO DE CARGO EN
EL EDIFICIO NUM. 1

ESCENA DEL CRIMEN
INCORRECTA SEGUN
EL TESTIGO DE
CARGO

ESCENA DEL CRIMEN
(Area X)

624

EXHIBIT 2 (Defensa)
VISTA ESCENA DEL
CRIMEN CORRECTA
(AREA X)

*NOTA DEL COMPILADOR:*

La fotocomposición utilizada en estos apéndices es una cortesía de Publicaciones J.T.S., Inc.