# 2002 DTA 143

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL VI - CAGUAS/HUMACAO/GUAYAMA

EL PUEBLO DE PUERTO RICO
Apelado

v.

LUIS VELEZ CALDERON
Apelante

Núm. KLAN-01-00926

San Juan, Puerto Rico, a 20 de septiembre de 2002

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Rodríguez García y Salas Soler

Salas Soler, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece Luis Vélez Calderón, en el interés de obtener la revocación de una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas. Mediante la misma, el Tribunal condenó al apelante a cumplir una pena de reclusión mixta de diez (10) años al resultar culpable por el delito de homicidio.

Por los fundamentos que habremos de exponer, se confirma la sentencia apelada.

## <u>HECHOS</u>

El 23 de octubre de 2000, el Ministerio Público denunció al apelante, Luis Vélez Calderón, por el delito de asesinato en segundo grado. La denuncia, entre otras cosas, contenía lo siguiente: *"El referido acusado..., allá o para el día 9 de octubre de 2000,...ilegal, voluntaria y maliciosamente, con la intención criminal y con malicia premeditada, dio muerte al ser humano Yamillette González Carrasquillo de cuatro años de edad, consistente en que mediando un patrón de maltrato contra la menor y consistente en que le propinaba fuertes golpes en ambos costados, abdomen, cabeza y otras partes del cuerpo que le produjeron un severo trauma corporal cuya consecuencia le causó la muerte."*

Yamillette era hija de la compañera consensual de Vélez Calderón, Jannette Carrasquillo Torres. Este trabajaba como Agente Investigador para la Policía de Puerto Rico. Según reflejó la autopsia, en el cuerpo de la niña se encontraron señales de un patrón constante de maltrato físico.

La primera testigo presentada por el Ministerio Público fue Carmen M. Figueroa Agosto, maestra de Kindergarden hace 13 años en la Escuela Nereida Alicea, donde estaba matriculada Yamillette. El 8 de

septiembre de 2000, dicha maestra se percató de que Yamillette tenía marcas en los muslos. (El uniforme de los estudiantes consiste, entre otras piezas, de un pantalón corto.) La Sra. Figueroa le preguntó a Yamillette que qué le había pasado; la niña le contestó que había sido su papá que le había dado esos correazos. La Sra. Figueroa buscó a otra maestra para que le cuidara a sus estudiantes en lo que llevaba a Yamillette a entrevistarse con la trabajadora social de la escuela, Elizabeth Correa Soto. La Sra. Correa entrevistó a la niña y la regresó al salón.

La maestra y la trabajadora social acordaron reunirse con la madre de Yamillette ese mismo día al terminar las clases a las 2:30pm. Decidieron que no iban a esperar que pasara el fin de semana, y que no citarían por carta, ya que se atrasaría el proceso. Durante la reunión, la maestra y la trabajadora social le preguntaron a Jannette, la madre de Yamillette, acerca de los golpes de la niña. Jannette les explicó que se los había ocasionada su hermanita menor al jugar de manos, y comentó que peleaban mucho. La maestra le preguntó si el papá de la niña estaba esperándolas en el carro, a lo que Jannette contestó que sí. La maestra se excusó de la reunión y fue a buscar a Vélez Calderón para convidarlo a la reunión. Cuando la maestra y la trabajadora social le explicaron la razón de la reunión, éste aceptó que él le había pegado a la niña. No dijo con qué le había pegado, pero explicó que fue para castigarla porque había perdido la paciencia. Añadió que las niñas peleaban mucho entre sí, y que para evitar que Yamillette le diera a su hermanita menor, él le pegó a Yamillette. Comentó que no sabía porqué la mamá negó que había sido él, si ella sabía que había sido él.

Como Vélez Calderón dijo que no tenía trabajo los viernes, la trabajadora social le pidió que se reuniera con ella y con la mamá de la niña durante ese día para ofrecerles terapias. Posteriormente, la maestra le preguntó a la trabajadora social si ellos habían recibidos las terapias y ésta le contestó que no fueron el primer viernes, no se excusaron y que tampoco fueron el segundo viernes. Posterior a este incidente, la niña comenzó un patrón de ausentismo al salón de clases. Faltó el lunes 11 de septiembre de 2000, el 12 y el 13; el 14 de septiembre asistió a clases. Luego, volvió a ausentarse el viernes 15 de septiembre, el 18, 19 y 20; el jueves 21 de septiembre estuvo presente, pero, el viernes 22 se ausentó. El 3 y 4 de octubre, se ausentó; luego, asistió el jueves 5 de octubre y volvió a faltar el viernes. (Páginas 1 a la 3 de la Exposición Narrativa de la Prueba Estipulada por las Partes, "ENP".)

La Sra. Correa también fue traída por el Ministerio Público para testificar. Esta explicó que llevaba alrededor de diez (10) años desempeñándose como trabajadora social en la escuela que asistía Yamillette. Dijo que conoció a la niña el día que la Sra. Figueroa la llevó a su oficina por los golpes en el cuerpo. Ese mismo día también, fue cuando entrevistó a Vélez Calderón y a Jannette Carrasquillo junto a la maestra de Yamillette. Sobre esa reunión, en síntesis, dijo que Vélez Calderón admitió inmediatamente que sí le había pegado a la niña, y ella le explicó que esa conducta implicaba maltrato. Que al principio Vélez Calderón se puso a la defensiva, dijo que él no lo veía así, pero después se disculpó y se mostró más receptivo. Incluso, señaló que los viernes era su día libre y que estaba dispuesto a recibir la ayuda terapéutica que ella le había ofrecido tanto a él como a Jannette. La trabajadora social dijo que él se comprometió a que esa acción no se iba a repetir, pues en aquel momento había perdido el control con la niña.

La trabajadora social entendió que el acuerdo había sido que ambos asistirían a la escuela para recibir las terapias, pero ellos nunca volvieron a su oficina. En dos ocasiones vio a Jannette esperando a que Yamillette saliera de clases, pero Jannette la evadía y le viraba la cara. Cuando se enteró del patrón de ausencias de la niña, tomó la decisión de referir su caso a la supervisora del Departamento de la Familia. (Páginas 4 a la 6 de la ENP.)

El caso de Yamillette fue referido a la Sra. Rosa María Orellano Rosario, quien llevaba 22 años como técnica de servicios a familias y niños en el Departamento de la Familia. El Ministerio Público la llevó como testigo. Relató que el referido que hizo la trabajadora social de la escuela que asistía Yamillette llegó el 25 de septiembre de 2000, y se lo asignaron a ella como un caso de maltrato. La trabajadora social informó que los niños no tendrían clases del 25 al 29 de septiembre porque iban a reparar los salones. Por lo tanto, la Supervisora del Departamento de la Familia le pidió a la Sra. Orellano que se movilizara a la comunidad donde vivía Yamillette.

Durante su visita, la Sra. Orellano no encontró a nadie, por lo que procedió a dejarle una notificación en la puerta a los padres de Yamillette. La Sra. Orellano entrevistó a una vecina llamada María. Le preguntó si había escuchado que maltrataran a las niñas, si utilizaban palabras obscenas o hubiese escuchado golpes, a lo que la vecina contestó que no. Ese mismo día, como a la 1:30pm, Vélez Calderón contestó la notificación dejada en su puerta llamando a la Sra. Orellano. Dijo que no podía reunirse porque estaba sometiendo un caso de drogas; aún así, la Sra. Orellano lo citó para el 2 de octubre de 2000.

Vélez Calderón asistió a la reunión acompañado de Jannette. Luego de hablar de la situación de la niña, la Sra. Orellano le explicó que el procedimiento era que ella iba a visitar la comunidad y la escuela. También, que iba a ver a las niñas para coordinar y brindarle los servicios necesarios. Este plan nunca se concretizó. El 9 de octubre de 2000, la trabajadora social del Hospital Interamericano de Medicina Avanzada (HIMA) llamó a la Sra. Orellano y le informó que Yamillette fue hospitalizada porque estaba en *"shock"*, y que el sonograma reflejó hemorragias. Se mantuvieron en comunicación hasta las 4:00 de la tarde; debido al estado de emergencia, la niña fue transferida al Hospital Pediátrico de Centro Médico. La Sra. Orellano notificó la situación a sus superiores; éstos le dieron instrucciones de movilizarse el día siguiente al hospital. Lamentablemente, a las 6:00 de la mañana del día siguiente, la Sra. Orellano escuchó en las noticias que la niña había fallecido. (Páginas 6 a la 9 de la ENP.)

La enfermera que atendió a Yamillette en la Sala de Emergencias del Hospital HIMA también fue traída como testigo. La Sra. Marielys Pérez Rojas dijo que llevaba 6 años en dicha sala, por lo que ha tenido que atender todo tipo de pacientes. Relató que el 8 de octubre de 2000, llegó a la sala un caballero con una niña en los brazos gritando que se le muere la nena, que ella empezó a gritar también y la pasó al área de *"cardio"*. El la colocó en la camilla. Cuando ella le alzó la pijamita observó muchos hematomas en el pecho y abdomen de la niña. El Dr. Rivera Pomales y el pediatra Dr. Sepúlveda fueron a atender a la niña. Ella salió con Vélez Calderón y le preguntó si la nena tenía vómitos o diarreas o algo así; él le contestó que no. Estaba nervioso, sudoroso, y le volvió a decir no, que no tenía nada. La enfermera informó a los doctores que Vélez Calderón dijo que la nena no tenía nada. El pediatra le dijo a la enfermera que no podía ser, por lo que ella volvió a salir para preguntarle a Vélez Calderón qué había sucedido. Esta vez, Vélez Calderón le dijo que tuvo dos (2) vómitos. (Páginas 11 y 12 de la ENP.)

La oficinista de la Sala de Emergencias, la Sra. Norah Ivette Flores Medina, testificó que llamó a Vélez Calderón para llenarle el expediente financiero para poder facturar los servicios. Cuando le preguntó a Vélez Calderón porqué trajo a la niña, él le explicó que estando en el juego de pelota, la nena empezó a vomitar. Luego la llevó a la casa para bañarla, la nena se desmayó, la recogió y la llevó al hospital. La testigo dijo que lo notó ansioso y sudoroso. (Páginas 12 y 13 de la ENP.)

Otra enfermera que trató a Yamillette en la Sala de Emergencias, la Sra. Suheil González Vázquez, testificó entre otras cosas que cuando fue a informarle el estado de la niña a Vélez Calderón lo notó ansioso y sudoroso. La enfermera, quien llevaba 4 años trabajando en dicha sala, añadió: *"...y me dio olor a alcohol"*, refiriéndose al apelante. (Páginas 13 y 14 de la ENP.)

.El Dr. Luis Adrián Rivera Pomales, quien atendió a Yamillette en la Sala de Emergencias, testificó que la condición severa en que se encontraba la niña no era el resultado de *"dos vómitos"*. Explicó que la niña estaba inconsciente, no respondía a estímulos de dolor, tenía las presiones bajas y hubo que resucitarla. Se veía flaca y caquésica, lo que significa mala nutrición calórica. Le llamó la atención un hematoma introabdominal que tenía la niña. Era una marca violácea que es característica de trauma de severidad. (Páginas 14 a la 19 de la ENP.) El Dr. Luis Adrián Rivera consultó con el pediatra [que junto a él asistía a la niña] las posibles causas del hematoma y condición de la paciente. Este pediatra, Domingo Sepúlveda Feliciano, se desempeñaba como Jefe del Departamento de Pediatría, y a su vez, como Jefe del Departamento de Emergencia.

Al testificar, el pediatra añadió que la niña también tenía hematomas en los muslos y en las piernas. Relató

que salió varias veces a hablar con Vélez Calderón y *"...Al principio, antes de todo, cuando ella llegó, hablé unos segunditos con él [Vélez Calderón], fue cuando él me dijo que la paciente estaba bien, estaba estable, estaban en un juego de pelota y que de golpe se fue en "shock" y que había estado vomitando durante cuatro días. Hablé como tres veces con él; después cuando bajé, volví a hablar con él en esa ocasión, pues él me dijo que la paciente había tenido un problema y se había caído en el baño de su casa, que se había caído en el baño y había tenido golpes en el baño de su casa, luego de eso no hablamos nada más."* (Páginas 19 a la 21 de la ENP.)

La Dra. Teresita Avilés fue la cirujana pediátrica que operó a Yamillette cuando tuvo que ser transferida a Centro Médico para ser operada. Al testificar, explicó que:

*"... tan pronto abrimos, estaba tenso y apretado dentro de la barriga una cantidad grande de sangre, vieja y nueva con coágulos, material dentro del intestino, material fecal y un olor bien fuerte a muerte, a tejido gangrenoso muerto, junto con tejido descompuesto, de muchas horas o días que llevaba muerto desde el abdomen. Nos encontramos con una laceración estrellada y grande de un lado a otro del hígado, en el óvulo derecho que incluia la vesícula, luego nos encontramos con pedazos de intestino en diferentes secciones, intestino delgado roto, todo eso desconectado.*

*[...]*

*Eso es compatible con un golpe sólido, fuerte, contundente, podría ser tipo tomate como mencionó su señoría, podría ser cuando los infantes son lanzados hacía las paredes como sabemos de otros historiales y de otros casos y de lo que leemos, puede ser un tipo de trauma como que le caiga una pared encima, puede ser accidente de carros, donde los niños queden pinchados, o sean lanzados o caigan contra muros o contra la parte de la carretera, contra postes, pueden ser golpes contundentes severos al abdomen, tipo puño o puños, patadas o batazos."* (Páginas 24 a la 27 de la ENP.)

Lamentablemente, Yamillette perdió la batalla para salvar su vida, aun con toda la atención médica que recibió. La Dra. María Conte Miller fue la Patóloga Forense que le practicó la autopsia a Yamillette. Esta doctora cuenta con una especialidad en Patología Anatómica y ha aprobado los *"boards"* en Patología Forense y Anatómica. Se desempeña como Patóloga Forense III en el Instituto de Ciencias Forenses de Puerto Rico. Mediante su testimonio, explicó los hallazgos del pequeño cadáver. Externamente encontró lesiones en la cara, en el abdomen y en las piernitas. Internamente, entre otras cosas, encontró el intestino y el hígado roto. Su opinión fue que era un caso de maltrato por la localización del trauma selectivo en el abdomen, porque el trauma fue repetitivo en diferentes períodos de tiempo y porque hubo una patente inconsistencia entre la explicación que se dio para explicar el trauma y los hallazgos de la autopsia. Determinó que fue un patrón de maltrato con diferentes episodios de golpes. (Páginas 29 a la 31 de la ENP.)

La Defensa llevó al Patólogo Anatómico y Forense, Dr. Francisco José Landrón Guardiola. Este patólogo estudió el Informe Médico Forense, autopsia # 4625-00, correspondiente al de Yamillette. Su opinión fue distinta a la de la patóloga Dra. María Conte Miller en cuanto al tipo de maltrato que sufrió Yamillette. Su opinión fue la siguiente: *"Yo no diría que es un patrón de maltrato, diría que esto es lo que llaman, un patrón de impulso, donde hubo unos golpes que se ven más o menos recientes, si es correcto, el protocolo que dice que en una de las heridas se ve el tejido de granulación, puede decir que algunas de estas heridas pueden ser de dos a cinco días antes de la muerte"*. (Páginas 37 a la 39 de la ENP.)

Por otro lado, algunos compañeros de trabajo de Vélez Calderón testificaron del día que Yamillette fue llevada al Hospital. El Agente Edgardo Deming Rodríguez y el Agente Juan de Dios testificaron básicamente lo mismo. Que el domingo 8 de octubre jugaron pelota con Vélez Calderón y que Yamillette se encontraba en los alrededores del parque. Ambos se percataron de que la niña se veía muy enferma ese día. (Páginas 9 a la 11 de

la ENP.) A lo anterior, el Agente Justo Maldonado añadió que le pidió a Vélez Calderón que abandonara el juego de pelota para que llevara a la niña al hospital. Vélez Calderón le dijo que estaban ganando, por lo que no abandonaría el juego, a lo que Justo Maldonado replicó que aceptaba que se quedara, pero con la encomienda que saliera del parque directo para el hospital, lo que no sucedió. (Páginas 35 a la 37 de la ENP.)

Otro compañero de trabajo de Vélez Calderón que también sirvió de testigo fue el Agente Luis Meléndez Hernández, quien a su vez compartió una residencia durante un (1) año hasta finales de mayo de 2000. Fue para esta fecha que Vélez Calderón le pidió a Meléndez Hernández que se marchara de la residencia porque había conocido una muchacha bien buena y se quería casar con ella. Meléndez Hernández le indicó que lo pensara bien porque llevaba poquito tiempo de conocerla. No obstante, el apelante le dijo que deseaba convivir con Jannette y sus dos hijitas. Así las cosas, Meléndez Hernández comenzó a buscar apartamento para mudarse. Antes de retirarse de la residencia, tuvo la oportunidad de compartir con Jannette y sus dos hijitas cuando éstas visitaban al apelante. Dijo que el apelante trataba a las menores como si fuera su papá y no era agresivo con las niñas. (Páginas 3 y 4 de la ENP.)

Hasta aquí, los resúmenes de algunos de los testimonios de la prueba apreciada durante el juicio, vertidos en la Exposición Narrativa de la Prueba Estipulada por las partes.

Vélez Calderón renunció a su derecho de juicio por jurado. Aunque fue acusado de asesinato en segundo grado, resultó culpable por el delito de homicidio voluntario. El Tribunal lo condenó a cumplir una pena de reclusión mixta de diez (10) años; un (1) año de cárcel y nueve (9) en sentencia suspendida (probatoria).

Es de esta sentencia que Vélez Calderón acude ante este foro apelativo adjudicándole al Tribunal de Instancia la comisión de los siguientes errores:

*"PRIMER SEÑALAMIENTO DE ERROR*

*Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Caguas, al encontrar culpable al apelante por una infracción al Artículo 85 del Código Penal, no habiendo pasado prueba sobre los elementos del delito, más allá de duda razonable.*

*SEGUNDO DEÑALAMIENTO DE ERROR*

*Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Caguas, al admitir prueba de carácter.*

*TERCER SEÑALAMIENTO DE ERROR*

*Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Caguas, al decretar No Ha Lugar una moción de absolución perentoria.*

*CUARTO SEÑALAMIENTO DE ERROR*

*Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Caguas, al admitir prueba de hechos que no son pertinentes al caso.*

*QUINTO SEÑALAMIENTO DE ERROR*

*Erró el Honorable Tribunal de Primera Instancia, Sala Superior de Caguas, al encontrar culpable al apelante a base de prueba especulativa y que no probara el caso más allá de duda razonable."*

Posteriormente, le concedimos término a la Oficina del Procurador General para que se expresara respecto a los méritos del recurso presentado. Habiendo comparecido el 30 de agosto de 2002, nos encontramos en posición de resolver.

## EXPOSICION Y ANALISIS

El apelante optó por discutir sus señalamientos de error en conjunto. Debido a que en sus argumentos no hubo discusión ni fundamento legal alguno relacionado con el segundo, tercero y cuarto señalamiento de error, nos abstenemos de adjudicar los méritos de esos planteamientos. Es norma reiterada que la sola alegación de un error en un recurso apelativo, que luego no es fundamentado ni discutido por el apelante, no es suficiente para revocar la decisión cuya revisión se solicita. *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 165 (1996); *J. R.T. v. Hato Rey Psychiatric Hospital,* 119 D.P.R. 62 (1987).

Además, la Regla 28 de Nuestro Reglamento explica con claridad que no tan sólo se debe incluir el señalamiento de error que a juicio del apelante cometió el tribunal sentenciador, sino que también el apelante tiene que discutir el mismo fundamentándose en las autoridades legales pertinentes. 4 L.P.R.A. Ap. XXII-A, R. 28(C)(1)(e) y (f). Por consiguiente, procedemos a discutir el primer y quinto señalamiento de error. Por su estrecha relación, ambos señalamientos se discutirán en conjunto.

El delito de homicidio, según tipificado en el Artículo 85 del Código Penal, 33 L.P.R.A., sec. 4004, dispone que debe ser sancionada la persona que de muerte a otra en ocasión de súbita pendencia o arrebato de cólera. En la modalidad por arrebato de cólera, se requiere provocación. Para que la provocación reduzca el delito de asesinato a homicidio voluntario, tiene que ser aquélla de naturaleza tal que haga perder el dominio de sí mismo a un hombre de temperamento corriente obligándolo a actuar por el impulso producido por notable provocación, sin la debida reflexión y sin formar un determinado propósito. *Pueblo v. Gómez Nazario*, 121 D.P.R. 66 (1988).

No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el juzgador es el llamado a aquilatar la misma. De haber alguna evidencia tendente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al juzgador al que le incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fue homicidio voluntario y no un asesinato.

En *Pueblo v. Miranda Ortiz,* 117 D.P.R. 188, 191-192 (1986), el Tribunal Supremo señaló que: "*...los jueces de instancia y los jurados son quienes están en mejor posición de aquilatar la prueba*". Véase, *Pueblo v. Pagán Díaz*, 111 D.P.R. 608, 621 (1981); *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984). Su apreciación merece gran respeto y deferencia. *Pueblo v. Nevárez Virella*, 101 D.P.R. 11 (1973). Es por ello que, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se intervendrá en la apreciación de la prueba que haga el jurado. *Pueblo v. Sanabria Pérez,* 113 D.P.R. 694, 699 (1983). Sin embargo, se ha resuelto que la determinación de si se ha probado la culpabilidad más allá de duda razonable es revisada como cuestión de derecho. *Pueblo v. Pagán Díaz, supra.*

Respecto al *quántum* de prueba necesario en un proceso criminal, reiteradamente se ha resuelto que el Estado tiene el deber de presentar prueba suficiente y satisfactoria que establezca, más allá de toda duda razonable, cada uno de los elementos del delito. *Pueblo v. Rosaly Soto*, 128 D.P.R. 729 (1991); *Pueblo v. Ramos y Alvarez*, 122 D.P.R. 287 (1988).

Este *quántum* exige que se prueben los elementos del delito imputado, y la conexión del acusado con el mismo mediante "*evidencia [que] establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón.*" *Pueblo v. Bigio,* 116 D.P.R. 748, 760-761 (1985). No obstante, para que una persona sea declarada culpable de la comisión de un delito, la prueba no tiene que destruir toda duda posible. Tampoco tiene

que establecerse la culpabilidad del acusado con certeza matemática. Basta que se pruebe la comisión del delito por el imputado con prueba más allá de duda razonable. *"Duda razonable es una duda fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso. No debe ser, pues, una duda especulativa o imaginaria." Pueblo v. Bigio, supra.*

En el caso de autos, examinada la totalidad de la exposición narrativa de la prueba, concluimos que la prueba presentada por el Ministerio Público expone no solamente todos los elementos requeridos por el Artículo 85 del Código Penal, *supra,* sino los de asesinato, por lo que se demostró la culpabilidad del apelante. En síntesis, la prueba circunstancial presentada en este caso es abrumadora e identifica el apelante como el autor de los hechos delictivos en cuestión. La Regla 10(H) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(H), dispone que cualquier hecho en controversia es susceptible de ser demostrado por prueba directa o mediante evidencia indirecta o circunstancial.

Este último tipo de evidencia es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia. Es norma establecida que la prueba circunstancial es intrínsecamente igual a la directa. *Pueblo v. Pagán, Ortiz,* 130 D.P.R. 470, 479 (1992); *Pueblo v. López Rodríguez,* 118 D.P.R. 616 (1987). Asimismo, una convicción puede estar válidamente sostenida por prueba indirecta o circunstancial, siempre y cuando la culpabilidad del acusado se establezca fuera de duda razonable. *Pueblo v. Picó Vidal,* 99 D.P.R. 708, 713 (1971). La culpabilidad del acusado no tiene que ser incompatible con otra hipótesis razonable de inocencia. *Pueblo v. Ortiz Rodríguez,* 100 D.P.R. 972, 978 (1972).

La característica fundamental de la prueba circunstancial es que la evidencia ofrecida, aunque fuere creída, no es por sí sola suficiente para probar el hecho que se pretende probar con ella. Requiere de un proceso de inferencias en unión a otra evidencia ya admitida o un razonamiento basado en la experiencia y las inferencias que hace una persona razonable. Se trata de que las circunstancias apuntan en dirección favorable a la inferencia. En su discernimiento al considerar la evidencia circunstancial aducida para probar un hecho, el juzgador debe reconocer la distinción entre aquélla que es una mera conjetura y la que es una inferencia razonable. *Admor. F.S.E. v. Almacén Ramón Rosa,* __D.P.R.__(2000), **2000 J.T.S. 122**, opinión de 30 de junio del 2000.

Finalmente, no intervendremos con la valoración de la prueba que haga el juzgador de los hechos, ya sea el jurado o el juez, en ausencia de pasión, prejuicio, parcialidad o error manifiesto y a menos que la apreciación de la evidencia se aleje de la realidad factual o la prueba sea inherentemente imposible o increíble. *Pueblo v. Maisonave Rodríguez,* 129 D.P.R. 49, 63 (1991); *Pueblo v. Rivero, Lugo y Almodóvar,* 121 D.P.R. 454 (1988).

Lamentablemente, en Puerto Rico, los casos de maltrato a menores dejan de ser improbables e inverosímiles para convertirse en una alarmante realidad. Según las estadísticas del Departamento de la Familia durante julio de 2000 hasta junio de 2001, el total de quejas recibidas en las que se indicaba que un menor era víctima de maltrato, o estaba en riesgo de serlo, ascendió a 36,890 casos. (Departamento de la Familia, Administración de Familias y Niños, Programa de Protección Social a Menores, Movimiento de Referidos.)

Con estos principios en perspectiva, apreciamos que la prueba desfilada creída por el foro de instancia demostró múltiples circunstancias que analizadas en conjunto establecieron la inferencia razonable de que el apelante fue la persona que cometió los actos delictivos en cuestión. De los testimonios de Carmen M. Figueroa, la maestra de Yamillette, y el de la trabajadora social de la escuela, Elizabeth Correa, surge suficiente evidencia circunstancial para llegar a tal conclusión.

En sus testimonios, ambas señalaron que Vélez Calderón justificó los golpes que le propinó a Yamillette con el hecho de que esta niñita **le hizo perder la paciencia**. El apelante argumenta en su escrito que no fueron

probados los elementos del delito de homicidio en la modalidad de arrebato de cólera ni en la modalidad de súbita pendencia. El apelante concluyó que **no existe un sólo hecho** del cual pueda inferirse que haya reaccionado en forma violenta, impensada o irreflexiva; no surge que la alegada víctima lo haya provocado de forma alguna y mucho menos que **le hubiere hecho perder el control.** (Página 11 del escrito de Apelación.) Lamentablemente, el apelante se contradice.

Cierto es que no es normal que una niña de cuatro años de edad lleve a una persona ordinaria, de temperamento corriente a perder su dominio; pero, según la percepción de Vélez Calderón, Yamillette sí provocó que él perdiera la paciencia cuando ésta le pegaba a su hermanita menor. Acto, que según el apelante, justificó los correazos que le propinó, los cuales también fueron suficientes para que el Departamento de la Familia interviniera en este caso. No hay que ser un perito en trabajo social para comprender que Yamillette sólo repetía con su hermanita el patrón de maltrato que ella misma sufría.

A lo anterior se añade que hemos examinado los testimonios de los patólogos forenses pudiendo advertir que los mismos sirvieron la función de corroborar los testimonios de varios testigos y las sospechas del Departamento de la Familia acerca del maltrato físico que recibió Yamillette. Repasamos; según los cálculos del Agente Meléndez Hernández, para mayo de 2000, tuvo que desalojar la residencia que compartía con el apelante porque la madre de Yamillette se mudaría a la misma. Sólo cuatro meses después, o sea el 8 de septiembre, la maestra de Yamillette se da cuenta de los golpes que exhibía la niña. Posterior a la reunión en la cual Vélez Calderón admitió que Yamillette *"lo hacía perder la paciencia"*, la niña comenzó un patrón de ausentismo a clases. También, Vélez Calderón se comprometió a recibir terapias con la trabajadora social, lo que no hizo. Ya para el 8 de octubre de 2000, la niña estaba en un estado tan crítico de salud, que varias personas se percataron de ello mientras jugaban pelota. De ahí surge la promesa de Vélez Calderón al Agente Justo Maldonado de que tan pronto se acabara el juego de pelota, llevaría a la niña al hospital, lo que tampoco hizo. Cuando finamente la lleva al hospital, primero dijo que la niña nunca vomitó; después, que tuvo dos vómitos; luego, que se fue en *"shock"* en el juego de pelota; y por último, que se cayó en la bañera.

A juicio nuestro, todas estas circunstancias relevantes nos permiten inferir razonablemente que el apelante fue el autor de la muerte de Yamillette. La prueba desfilada apunta con gran fuerza en dirección favorable a esa inferencia. Ello nos produce esa certeza moral necesaria en nuestras conciencias. De tal forma, consideramos esas circunstancias suficientes para derrotar la presunción de inocencia y establecer la culpabilidad del apelante más allá de duda razonable. Ciertamente, el foro de instancia tuvo ante sí prueba capaz para así determinarlo. No puede el apelante hacernos creer que siempre actuó como un buen padre de familia cuando le pegó a la niña; no procuró la asistencia de la niña a la escuela; y esperó hasta el último instante para llevarla a una Sala de Emergencias, aun cuando desde horas antes sus compañeros de juego y trabajo le pidieron que se preocupara por ella. Por tanto, no se equivocó el Tribunal de Primera Instancia cuando, luego de sopesar el valor probatorio de la evidencia en controversia frente a la acusación de asesinato en segundo grado, determinó admitir la evidencia como una suficiente para el delito de homicidio.

Este Tribunal concluye que no se cometieron los errores señalados. Como bien señaló el Procurador General, en su muy articulado informe: *"Tanto la prueba reveladora e inequívoca de este castigo desaforado, más el conocimiento de ello y la tardanza en llevar a la víctima a recibir el tratamiento médico necesario, tipifican un asesinato. Sin duda, el acusado-convicto se benefició al ser hallado culpable por homicidio".* (Página 11 del Informe del Procurador General.)

La prueba desfilada ante Instancia pudo haber sostenido una convicción por asesinato en segundo grado, optando el foro recurrido por hallar a Vélez Calderón culpable del delito incluido de homicidio, preguntamos entonces, ¿de qué se queja el convicto?

Por los fundamentos antes expuestos, se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General